BIG DOG LOGISTICS, INC., Big Dog Capital Corp., Big Dog Expediting, Inc., Big Dog Air Freight, Big Dog Logistics I, L.P., Big Dog Logistics, L.L.P., Frogfire Technologies, Inc., Big Dog Group, Inc., Daniel Kirk, and Kirk Lane, Appellants and Cross–Appellees,

v.

STRATEGIC IMPACT CORPORATION, Kim O. Brasch, and Maria C. Floudas, Appellees and Cross–Appellants.

No. 14–07–00892–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 30, 2010.

Christina Fontenot Crozier, Mark Allen Waite, Jeff T. Nobles, Sean P. Milligan, William B. Underwood, Houston, for appellants.

Pete Mai, Tammy Tran, Lloyd E. Kelley, Houston, Robert W. Higgason, The Woodlands, for appellees.

Panel consists of Chief Justice HEDGES and Justices SEYMORE and PRICE.*

* Senior Justice Frank C. Price sitting by assignment.

## OPINION

CHARLES W. SEYMORE, Justice.

This case involves an appeal and a cross-appeal from a final judgment rendered after a jury trial on several causes of action.

In the first appeal, Big Dog Logistics, Inc., Big Dog Capital Corp., Big Dog Expediting, Inc., Big Dog Air Freight, Big Dog Logistics I, L.P., Big Dog Logistics, L.L.P., Frogfire Technologies, Inc., and Big Dog Group, Inc. (collectively "Big Dog Logistics") appeal (1) a judgment in favor of Strategic Impact Corporation ("SIC") on its breach-of-contract claim against Big Dog Logistics and (2) a take-nothing judgment on Big Dog Logistics's breach-of-contract counterclaim against SIC.[1]

In the cross-appeal, SIC plus Kim O. Brasch and Maria C. Floudas (husband and wife owners of SIC) appeal (1) a take-nothing judgment on their fraud and conspiracy claims against Big Dog Logistics, Daniel Kirk (CEO of Big Dog Logistics), and Kirk Lane (president of Big Dog Logistics), and (2) the trial court's grant of judgment notwithstanding the verdict ("jnov") on theories for imposing personal liability on Kirk and Lane for the judgment against Big Dog Logistics.

We reverse and render with respect to the judgment in favor of SIC on its breach-of-contract claim against Big Dog Logistics and affirm the remainder of the judgment.

## I. BACKGROUND

### A. Factual Background

Big Dog Logistics is a "third party logistics carrier," which provides services to its customers to facilitate transportation of goods. SIC is a consulting business, which, among other purposes, devises strategies to assist its clients in expanding their business.

In late 2003, SIC approached Big Dog Logistics about a potential relationship. According to Big Dog Logistics, SIC proposed an opportunity involving both parties' buying scrap metal from another company and selling it for profit. Brasch testified he learned of Big Dog Logistics from another source who reported Big Dog Logistics was facing a challenge and needed a consultant. Regardless, Big Dog Logistics and SIC generally agree that they discussed the possibility of SIC's providing its services to assist Big Dog Logistics in obtaining business.

Big Dog Logistics and SIC executed three different contracts. The first two contracts were a non-disclosure agreement and a consulting agreement, which was later superceded by another consulting agreement pertinent to the present dispute.

Specifically, on June 10, 2004, the parties signed a "CONSULTING SERVICE AGREEMENT" ("CSA"). In essence, the CSA provided that SIC would use its established communication channels and experience to assist Big Dog Logistics in

---

1. The judgment was rendered with respect to all above-listed appellants collectively although the parties to the contract at issue were "Big Dog Logistics, Fire Frog Technologies and their parent and/or subsidiary companies" and not all appellants were submitted in the jury charge. Because all these appellants are similarly situated relative to our analysis, we will refer to them collectively as "Big Dog Logistics." Further, one such party, Big Dog Group, Inc., was not named in appellees' petition although they sued an entity called "Big Dog Strategic Consulting Group, Inc.," which is also referenced in the parties' appellate briefs. Because Big Dog Group, Inc., not Big Dog Strategic Consulting Group, Inc., was the party against whom judgment was rendered and it filed a notice of appeal, we will treat it as an appellant.

pursuing "Prospect(s)," which was defined as "mutually agreed upon business opportunities." Among other responsibilities, SIC agreed to assist in identifying "key [p]roject participants," introducing them to Big Dog Logistics, and managing the business-development aspect of a project.

The CSA included a section regarding compensation for SIC's services. Big Dog Logistics was required to pay SIC a monthly retainer of $8,250 for a period of one year. The agreement also provided,

> [Big Dog Logistics] agrees to pay a mutually agreed upon bonus fee for transactions generated through the closing of any transaction between [Big Dog Logistics] and Prospect[s] as defined herein for the period of the agreement(s) between the Prospect its agents, its assigns, or other persons or entities over which the introduced Prospect has any control or influence and [Big Dog Logistics], their agents, assigns, or any other person or entity over which [Big Dog Logistics] has any control or influence. This bonus is to be negotiated and agreed upon in writing prior to the commencement of any initiative/project.

In the CSA, the parties also agreed that, "[i]f required," they would form a new corporation for performance of SIC's services. The parties separately agreed the new corporation would be called "Big Dog Strategic Consulting Group, Inc." and would receive revenues generated through the relationship outlined in the CSA.

At the heart of this dispute was another document entitled "BIG DOG STRATEGIC CONSULTING GROUP INITIATIVE LIST" ("the Initiative List"), which consisted of three pages and was admitted as a separate exhibit than the CSA. The Initiative List admitted at trial had a hand-written notation "June 10th 2004" above the title but was not signed or initialed by either party. Under the title were the names of two columns: "Initiative and (sub-initiatives)" and "pside split (SIC/BDL)." The Initiative List then contained a number of entries itemized according to various company names. Under most of these company names was a brief description of a type of service or product followed by numbers shown as, for example, "50/50," "70/30," "60/40."

The parties advance vastly different positions regarding the import of the Initiative List as well as other events relative to this suit.

SIC claims the Initiative List outlined the parties' agreement on projects to pursue and SIC's bonuses. Specifically, Brasch testified that the parties negotiated the Initiative List during May and June 2004. When Brasch, Floudas, Kirk, and Lane met on June 10, 2004 to execute the CSA, they agreed on the Initiative List. Kirk wrote "June 10, 2004" on the Initiative List and attached it to the CSA. Brasch offered an explanation for the lack of any initials on the Initiative List: the CSA was already printed when the parties met on June 10, 2004; however, they were still developing the Initiative List and, therefore, it was on a different computer; once the parties agreed on the Initiative List, they printed it and "didn't think of initialing." When Floudas was asked why the pages of the Initiative List were not initialed, she replied, "It wasn't required. We didn't think of it. We didn't get to it." Brasch also indicated that "pside split (SIC/BDL)"—the numbers such as "30/70" corresponding with a particular project— meant percentages that SIC and Big Dog Logistics respectively would each receive from gross revenues generated by that project. Brasch suggested the parties agreed on a revenue split because it was simpler than analyzing costs for a project before knowing what costs might be in-

curred and some projects involve minimal costs.

In contrast, Big Dog Logistics contends the Initiative List was merely a proposal by SIC, and Big Dog Logistics did not agree to any bonus structure outlined therein. According to the testimony of Kirk and Lane, they did not know who wrote the June 10th date on the Initiative List, they did not see the Initiative List before the CSA was signed, they did not attach it to the CSA, and "the two documents don't go together." Big Dog Logistics also presented an e-mail Floudas sent to Kirk and Lane on June 11, 2004 (the day after the parties signed the CSA), stating in pertinent part,

> Thanks for lunch yesterday. I am excited about being formally associated with you guys. I know that we will make tons of money.
>
> As promised, following is a list of our proposed initiatives with proposed project upside splits between us. Please review and ponder it over the weekend. Dan, we will see you on Monday at 10:00 and discuss it further.
>
> . . .

The Initiative List was attached to this e-mail, but there was no hand-written notation "June 10, 2004" on this copy.

Brasch and Floudas attempted to explain the use of the term "proposed" in this e-mail: Big Dog Logistics requested a "soft copy" of the Initiative List and, although the parties had already agreed on these initiatives, they wanted to ponder whether there were any initiatives to add. At another point, Brasch simply admitted

that Floudas may have used the "wrong word" by referring to "proposed" initiatives.

Pertinent to this case was the following item on the Initiative List:

*Deutsche Post*

 1. Logistics—30/70

Deutsche Post is a German company which manages the German postal service and also operates other companies worldwide under the banner of "DHL." In May 2004, Deutsche Post purchased a company named "SmartMail" and changed its name to "DHL Global Mail." SmartMail, now DHL Global Mail, has been Big Dog Logistics's client since 2001 and has accounted for the majority of its revenues.[2] Deutsche Post also purchased DHL Express, with whom Big Dog Logistics also had a relationship.[3]

Brasch testified that the parties intended for the "Deutsche Post" entry on the Initiative List to include DHL Global Mail because Big Dog Logistics's contract with DHL Global Mail was due to expire in August 2004 and Big Dog Logistics was concerned about losing the business in light of Deutsche Post's purchase of DHL Global Mail. Brasch suggested Big Dog Logistics understood that Brasch's German nationality, contacts, and experience would benefit Big Dog Logistics in attempting to retain DHL Global Mail as a client, and Lane expressed Big Dog Logistics's willingness to share its revenues to achieve that purpose. Therefore, Brasch indicated that the above-cited "Deutsche Post" entry meant Big Dog Logistics

**2.** In the briefs and record, this company is referred to by several variations including both "DHL Global Mail" and "Global Mail." For consistency, throughout this opinion, we will use "DHL Global Mail" to refer to both that company and its predecessor, "Smart-Mail."

**3.** We have also noticed more than one variation for the entity referred to as "DHL Express," but we will use this name.

agreed to pay SIC 30% of its gross revenues from DHL Global Mail.

According to the testimony of Kirk and Lane, they never asked SIC to pursue any business with Big Dog Logistics's existing customers, particularly the DHL entities, and only enlisted SIC's services to solicit new business. Moreover, they claimed that Big Dog Logistics never would have agreed to pay anyone 30% of its gross revenues from DHL Global Mail because it did not even net that amount after costs and overhead.

In any event, Brasch testified that he thereafter made contact with the DHL entities with Big Dog Logistics's approval and participation. Through his various contacts, Brasch was granted an appointment with Klaus Knappik, who was in charge of the integration phase relative to Deutsche Post's purchase of DHL Global Mail. Knappik was unable to attend the scheduled meeting because of a conflict, so he referred Brasch to Dr. Gerhard Gompf, the new head of DHL Global Mail responsible for making recommendations regarding business components of the company that could potentially be eliminated.

Brasch spoke with Dr. Gompf by telephone. Brasch testified that he introduced Big Dog Strategic Consulting Group, Inc., made the presentation he had planned for Knappik, and was well received by Dr. Gompf. In contrast, Dr. Gompf testified that Brasch said he wanted to help DHL Global Mail eliminate its "dependency" on Big Dog Logistics. When asked whether Brasch made any statements to promote Big Dog Logistics's services, Dr. Gompf replied, "No. Just the opposite." When further asked whether Brasch or SIC played any role in Big Dog Logistics's retention of DHL Global Mail's business, Dr. Gompf responded, "Again, exactly the opposite. I had the impression the call was made to help us get away from Big Dog Logistics."

Brasch further testified that, through his contacts, he was also referred to Chet Paul, a regional sales director of DHL Express. Brasch and Paul negotiated a contract between DHL Express and "Big Dog Strategic Consulting Group," which was signed in late August 2004. Brasch claimed that this contract was part of his strategy to retain the DHL Global Mail business for Big Dog Logistics. Brasch planned to use this contract in his presentation to Deutsche Post as an example of a strategic alliance that could be formed between Big Dog Strategic Consulting Group, Inc. and Deutsche Post entities to make profits, so Deutsche Post would not view Big Dog Logistics as a cost center to be eliminated. Brasch further testified that, after this contract was signed, he initiated scheduling a meeting so that he, Kirk, and Lane could meet Paul.

Again, Big Dog Logistics presented contrasting testimony, claiming it first learned of this contract shortly after it was signed. According to Kirk, he was the person involved in arranging a meeting with DHL Express representatives, and they informed him DHL Express was already involved in discussions with the CEO of Big Dog Logistics, which Kirk knew was incorrect.

On September 7, 2004, Chet Paul and two other DHL representatives, Marc Casaccia and Jeffrey Corte, arrived at Big Dog Logistics's office for the scheduled meeting, which resulted in execution of a contract between Big Dog Logistics and DHL Express. According to Corte, Brasch "barged" into the meeting and yelled expletives at Kirk. However, Brasch provided the following version of this incident: Kirk was hostile and excluded him from the meeting, stating "You're out of that deal"; Brasch responded that "this is

an introduced party as defined in the agreement"; he told all participants the agreement between Big Dog Logistics and SIC was violated "if I'm cut out"; and he left without causing "a scene" and called Lane to inquire about Kirk's actions.

The next day, Lane met with Brasch and Floudas. Lane testified that he explained the relationship "wasn't going well," "sales had been zero," and Big Dog Logistics never asked SIC to become involved with its "current customers" or "agent base." Lane then suggested that the parties complete the arrangement regarding the scrap-metal purchase, which he considered the only possible remaining basis for a relationship. Brasch and Floudas then threatened to destroy Lane's business and reputation. Big Dog Logistics then paid the monthly retainer due on October 1, 2004 but quit paying the retainers once it was sued by SIC.

According to Brasch, Lane stated that Big Dog Logistics would continue to perform the CSA only if SIC refrained from performing work on the Deutsche Post initiative. Brasch replied that SIC was owed bonuses because of its work on the Deutsche Post initiative. Lane subsequently expressed that Big Dog Logistics would continue to perform the CSA and pay the bonuses. However, after stalling on paying the bonuses, Big Dog Logistics ultimately refused to honor the CSA.

## B. Procedural History

SIC, Brasch, and Floudas sued Big Dog Logistics, Kirk, and Lane for various causes of action, including breach of contract, fraud, and conspiracy. SIC also requested that the corporate veil of the "Big Dog" entities named in the suit be pierced because Kirk and Lane used the corporate fiction to perpetuate fraud and alleged the "Big Dog" entities operated as a single business enterprise. Big Dog Logistics

filed a counterclaim for breach of contract, among other claims.

Relative to this appeal, the jury found as follows: Big Dog Logistics agreed to pay SIC 30% of all revenues from DHL Global Mail on or after September 1, 2004; Big Dog Logistics's failure to pay was not excused; SIC sustained damages of $1,298,902.90 resulting from Big Dog Logistics's failure to pay, which the parties seem to agree was approximately 30% of gross revenues from DHL Global Mail during a certain time period; certain amounts were reasonable fees for services of SIC's attorneys; Big Dog Logistics, Kirk, and Lane did not commit fraud against SIC, Brasch, and Floudas; several of the "Big Dog" entities, Kirk, and Lane operated as a single business enterprise; Kirk and Lane were each responsible for the conduct of Big Dog Logistics; and SIC did not fail to comply with the CSA. The jury did not answer the submitted question regarding conspiracy because an answer to this question was conditioned on an affirmative finding regarding fraud.

The trial court originally rendered judgment against Big Dog Logistics, Kirk, and Lane consistent with the jury's verdict. These parties subsequently filed a motion and supplemental motion for jnov relative to certain findings and a motion for new trial. The trial court granted jnov with respect to the findings that Kirk and Lane individually were part of a single business enterprise and were each responsible for the conduct of Big Dog Logistics. Our record does not include a written order on these parties' motion for new trial. Therefore, we treat the motion as overruled by operation of law except for portions rendered moot by grant of the jnov. SIC, Brasch, and Floudas also filed a motion for partial new trial, which the trial court denied by written order.

Accordingly, on November 2, 2007, the trial court signed an "Amended Final Judgment" (1) reciting that it had granted jnov on the theories for imposing personal liability on Kirk and Lane for the judgment against Big Dog Logistics, (2) awarding SIC $1,298,902.90 in actual damages, pre and post-judgment interest, costs of court, and attorney's fees for trial and appeal, against the Big Dog Logistics entities only, and (3) ordering that Big Dog Logistics take nothing on its breach-of-contract counterclaim. The trial court did not expressly order that SIC, Brasch, and Floudas take nothing on their fraud and conspiracy claims; however, the judgment implicitly encompassed such order by expressing that all relief not granted was denied and that it was a final judgment disposing of all causes of action in the suit.

## II. BIG DOG LOGISTIC'S APPEAL

Big Dog Logistics appeals (1) the judgment in favor of SIC on its breach-of-contract claim and (2) the take-nothing judgment on Big Dog Logistics's breach-of-contract counterclaim against SIC.

### A. SIC's Breach–of–Contract Claim Against Big Dog Logistics

In its first four issues, Big Dog Logistics challenges the award of damages to SIC on its breach-of-contract claim against Big Dog Logistics.

#### 1. Issues and Standard of Review

In its first three issues, Big Dog Logistics challenges the jury's affirmative answer to Question 1 of the charge which asked,

Did Big Dog Logistics make an agreement with [SIC] that Big Dog Logistics will pay 30% of all revenues from DHL Global Mail to [SIC] on or after September 1, 2004?

Big Dog Logistics contends the evidence is legally and factually insufficient to support this finding because (1) there was no such agreement in writing as required by the CSA, (2) the Initiative List lacked the essential terms necessary to constitute a contract, and (3) a reasonable juror could not have found that Big Dog Logistics entered into such an agreement. At trial, Big Dog Logistics objected to submission of Question 1, asserting, among other grounds, there was no evidence of any such agreement. Big Dog Logistics also moved for a new trial on this ground.

As both parties seem to acknowledge, there was no agreement to pay any particular bonuses in the CSA. Rather, the CSA required that bonuses be "agreed upon *in writing*" before commencement of a project. (emphasis added). The Initiative List was the only document that arguably could be characterized as such a writing; therefore, the parties focus their arguments on this document.

Although Big Dog Logistics presents three separate stated issues, it advances several interrelated substantive reasons the Initiative List was not a written agreement regarding projects and bonuses, much less an agreement to pay SIC 30% of gross revenues from DHL Global Mail: (1) Floudas's e-mail, sent the day *after* the parties signed the CSA, referred to the Initiative List as "our *proposed* initiatives with *proposed* project upside splits" (emphasis added); (2) the Initiative List lacked any signatures or initials to show the parties' assent thereto; (3) the Initiative List lacked the essential term of a "price" because the cryptic notation "30/70," even if it referred to percentages, did not indicate whether it meant percentages of gross profits, gross revenues, or some other amount, and Brasch's parol testimony could not establish the meaning of "30/70," *see Swinehart v. Stubbeman,*

*McRae, Sealy, Laughlin & Browder, Inc.,* 48 S.W.3d 865, 877 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (recognizing that, relative to contract required by law to be in writing, parol evidence may not supply essential elements but may be used to explain or clarify essential terms appearing in the instrument); (4) the testimony of Brasch and Floudas regarding the alleged agreement was conclusory and contradicted the documentary evidence;[4] (5) DHL Global Mail was not a "Prospect" within the purview of the CSA because it was an existing client, not a "mutually agreed upon business opportunit[y]," and SIC played no role in introducing DHL Global Mail to Big Dog Logistics; and (6) a finding that Big Dog Logistics agreed to a contract that caused it to lose money was irrational.[5]

In contrast, SIC characterizes the dispute on existence of an agreement as merely a factual issue on which we must defer to the jury's findings. SIC contends parol evidence was permissible merely to explain that the pertinent entry on the Initiative List meant Big Dog Logistics would pay SIC 30% of gross revenues from DHL Global Mail. SIC further argues that the jury was free to believe the testimony of Brasch and Floudas reflecting the parties orally agreed on June 10, 2004 to this bonus structure and attached the Initiative List to the CSA.

Big Dog Logistics's fourth issue is apparently an alternative argument. Big Dog Logistics contends Question 1 was improperly worded because the jury was allowed to find existence of an agreement regarding bonuses based solely on a purported oral agreement. Big Dog Logistics contends the trial court erred by refusing to submit Big Dog Logistics's alternative question, which would have more accurately apprised the jury a written agreement was required.

---

4. With respect to their testimony, Big Dog Logistics further claims that Brasch purportedly acknowledged the Initiative List was merely a proposal by stating there would be another "decision point" regarding bonuses after the parties reached an agreement with a third-party prospect. However, in the cited excerpt, it is not clear Brasch was referring to deferral of an agreement on bonuses until the parties reached an agreement with a prospect. Read in context, Brasch may have been explaining that, even after the parties agreed to an initiative split, they were not bound to accept an agreement with a prospect.

5. Big Dog Logistics also emphasizes SIC's petition contained allegations that were opposite to its position at trial and on appeal and essentially negated the parties agreed to any bonus structure purportedly outlined on the Initiative List when they executed the CSA. Specifically, SIC alleged that, "[o]n *June 11, 2004 [the day after the parties signed the CSA],* SIC prepared and forwarded a list of Prospects and Initiatives that included Deutsche Post ....," and "[a]t the same time, SIC and [Big Dog Logistics] *began negotiations* regarding the compensation percentage fee for these SIC Prospect [sic] if [Big Dog Logistics] were able to contract with one of these SIC Prospects." (emphasis added). SIC then alleged that the parties agreed to form "Big Dog Strategic Consulting Group, Inc.," through which SIC would be paid its percentage bonuses of "50% of gross profits of all brokered deals and 45% of all managed logistics projects." Additionally, the gravamen of the breach-of-contract claim as pleaded was that Big Dog Logistics committed a breach, or anticipatory breach, by prematurely terminating the CSA and thus depriving SIC of future payments due thereunder. However, later in the petition, SIC requested breach-of-contract damages of 50% of Big Dog Logistics's gross profits. Regardless, SIC did not plead that Big Dog Logistics agreed to pay SIC 30% of gross revenues from DHL Global Mail. However, Big Dog Logistics does not cite any portion of the record showing it requested the trial court to treat these allegations in SIC's petition as judicial admissions or objected to submission of Jury Question 1 because there was no supporting pleading. Consequently, we will not consider these allegations in our legal-sufficiency analysis.

We agree that the trial court erred by submitting any jury question regarding formation of an agreement requiring Big Dog Logistics to pay SIC 30% of revenues from DHL Global Mail because there was no evidence of a written agreement as required by the CSA. Therefore, we will discuss only Big Dog Logistics's no-evidence contention.

When examining a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. There is "no evidence" or legally-insufficient evidence when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810; *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller,* 168 S.W.3d at 827.

## 2. Analysis

We will assume, without deciding, the evidence was sufficient to show that the parties orally agreed on June 10, 2004 that Big Dog Logistics would pay SIC 30% of Big Dog Logistics's gross revenues from DHL Global Mail and attached the Initiative List to the CSA. Nevertheless, the evidence was legally insufficient to establish existence of an agreement enforceable under the CSA because there was no *writ-ing* showing the parties' assent to this bonus structure.

Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind. *Baylor University v. Sonnichsen,* 221 S.W.3d 632, 635 (Tex.2007). The Initiative List was not signed or initialed by either party, and it contained no language of assent; i.e., it included no statement that the parties agreed to any bonus structure listed therein. Although the testimony of Brasch and Floudas arguably showed the Initiative List was not merely a proposal, there was nothing on the list itself to show it was an agreement as opposed to a proposal. Quite simply, the Initiative List was just that—a "list" of various items—with nothing to demonstrate it constituted some type of agreement with respect to these items. In short, the Initiative List may have contained essential terms, but it did not include an *agreement.*

To purportedly overcome this deficiency, SIC suggests Brasch's testimony that the Initiative List was attached to the CSA on the day it was signed demonstrated it was "part" of the agreement. However, simply proving the Initiative List was attached to the CSA did not establish that the parties agreed *in writing* to the bonuses outlined on the Initiative List. Apparently, SIC claims the signatures on the CSA were sufficient to establish that any attached document represented an agreement of the parties. However, there was no reference to the Initiative List in the CSA and certainly no language indicating the parties agreed to the bonus structure outlined therein. In fact, the reference to bonuses in the CSA implied that the parties contemplated a future written agreement.

We find that cases addressing whether a writing was sufficient to satisfy the statute of frauds are persuasive al-

though Big Dog Logistics does not argue the agreement was required to satisfy the statute of frauds. To satisfy the statute of frauds, "there must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony." *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex.1978); *BACM 2001–1 San Felipe Rd. Ltd. P'ship v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137, 144 (Tex. App.-Houston [14th Dist.] 2007, pet. denied).

Several court have recognized that, under this rule, language showing the parties' assent to a particular agreement must be included within the written memorandum. For example, many years ago, in *Osborne v. Moore*, 112 Tex. 361, 361–65, 247 S.W. 498, 498–500 (Tex.1923), the court addressed whether a writing purportedly memorializing a sale of real property was sufficient to satisfy the statute of frauds. The writing offered by the plaintiff was a check made payable to the defendant for a certain amount which contained a memorandum stating "[t]o bind deal on [property description]" and the phrase "[a]ccepted. [defendant's agent]." 247 S.W. at 498. The court held that the memorandum lacked an express promise to sell or convey the property because the notation "to bind deal" did not necessarily imply such an agreement; this phrase could refer to an agreement to sell or convey property, but it could also refer to an entirely different transaction, such as an agreement to lease the property. *Id.* at 499. The defendant's agent testified he accepted the check in order to sell the property to the plaintiff. *Id.* at 498–99. However, the court held, "[p]arol evidence is not admissible to prove such an important element of the contract as the real kind or charac-

ter of the transaction actually agreed upon by the parties." *Id.* at 499.

In *Birenbaum v. Option Care, Inc.*, 971 S.W.2d 497, 501 (Tex.App.-Dallas 1997, pet. denied), the prospective seller of securities sued the prospective buyer for breach of contract after the buyer refused to consummate the transaction. The court of appeals held that a document sent by fax from the buyer to the seller was not a sufficient writing to satisfy the statute of frauds. *Id.* at 501–02. The document contained a stated quantity and price but was not signed. *Id.* at 501. Although the buyer signed a "post it" note transmitting the fax, the court concluded this signature did not "authenticate the document to which it was *attached* as the agreement of the parties." *Id.* at 502. The court rejected the seller's contention that the statute of frauds did not require language exhibiting a "present intention to be bound" and that there was no need "for the writing to contain verbs of commitment." *Id.* The court stated that the writing required to be signed for purposes of the statute of frauds is not just a "piece of paper" but a writing sufficient to indicate a contract has been made. *Id.* Although a "thumbprint would authenticate the writing as coming from its author," the writing still fails to satisfy the statute of frauds if it is not "sufficient to indicate that a contract has been made." *Id.*

Likewise, if we review the CSA and the Initiative List together, these writings did not show that the parties agreed Big Dog Logistics would pay the bonuses purportedly referenced on the Initiative List. The fact that the Initiative List was attached to the CSA which was signed by the parties demonstrated at most that Big Dog Logistics acknowledged the list as some sort of writing pertinent to the parties' relationship. Based solely on the writings, we cannot foreclose the possibility that the

Initiative List was merely a proposal or an example of the form required for a future agreement on bonuses, as opposed to a definitive agreement that Big Dog Logistics would pay the outlined percentages. Therefore, Brasch's or Floudas's testimony was still necessary to prove existence of the agreement. The fact that we cannot discern any such agreement without resorting to their testimony establishes there was no agreement in writing. This case is not a situation in which a party offered parol evidence to merely explain essential terms that were included within a written contract but were unclear. Rather, SIC relied on parol evidence to provide the assent necessary to establish an agreement in the first place.

Finally, SIC relies heavily on a pleading filed by Big Dog Logistics in a separate lawsuit. In 2006, Big Dog Logistics sued SIC, Brasch, and Floudas in federal court for trademark infringement and unfair competition related to their use of a "Big Dog Logistics" name and logo. Big Dog Logistics pleaded that the parties "executed a[CSA] on June 10, 2004, a copy of which is attached as **Exhibit A** . . . ." Exhibit A included both the CSA and the Initiative List as one document. In the present case, SIC argued to the trial court that the federal pleading was a "judicial admission" these documents were "the operative contract." The record does not reflect that the trial court admitted the federal complaint as a judicial admission. On appeal, SIC argues that, even if the federal complaint was not a judicial admission, it was some evidence that Big Dog Logistics viewed the Initiative List as the parties' agreement regarding bonuses.

Kirk and Lane essentially disavowed any role in attaching the two documents as one exhibit to the federal complaint, indicating instead that Big Dog Logistics's attorney in the federal suit (not the same attorney involved in the original contractual transaction) must have obtained both documents from Big Dog Logistics's files and attached them as one exhibit. Accordingly, Big Dog Logistics argues that a mistake by an attorney who was involved in the original transaction could not constitute a judicial admission that the parties agreed to the bonus structure purportedly outlined on the Initiative List.

Even if an assertion in the federal complaint could be construed as a judicial admission, the allegation therein showed at most that the Initiative List was attached to the CSA when executed by the parties. In the federal complaint, Big Dog Logistics did not assert that the Initiative List reflected an agreement regarding initiatives to be pursued and bonuses. We have explained that mere attachment of the Initiative List to the CSA was not sufficient to show a written agreement for payment of the bonuses purportedly outlined therein. Therefore, the fact the CSA and Initiative List were treated as one exhibit to the federal complaint was not evidence that the parties agreed *in writing* to the bonuses outlined in the Initiative List, as required by the CSA.

In sum, because the CSA required a written agreement regarding payment of bonuses and the only writing offered was insufficient to establish such an agreement, there was no evidence to support the finding that Big Dog Logistics agreed to pay SIC 30% percent of revenues from DHL Global Mail. Accordingly, we sustain Big Dog Logistics's first issue, which renders moot its second, third, and fourth issues.

**B. Big Dog Logistics's Breach–of–Contract Counterclaim Against SIC**

In its fifth issue, Big Dog Logistics contends the evidence is factually insufficient to support the jury's finding, in response to Question 15 of the charge, that SIC did

not breach the CSA. Big Dog Logistics presented this contention in its motion for new trial.

### 1. Standard of Review

In a factual-sufficiency review, we consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998); *Thomas v. Uzoka*, 290 S.W.3d 437, 452 (Tex.App.-Houston [14th Dist.] 2009, pet. denied). When, as here, a party attacks factual sufficiency with respect to an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001). We will set aside the finding only if it so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Because we are not a fact finder, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Mar. Overseas Corp.*, 971 S.W.2d at 407; *Thomas*, 290 S.W.3d at 452–53. The amount of evidence necessary to affirm a judgment is far less than the amount necessary to reverse it. *Thomas*, 290 S.W.3d at 452–53; *Pascouet*, 61 S.W.3d at 616. Thus, if we reverse a judgment for factually insufficiency, we must detail the evidence relevant to the issue and state how the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming a jury's verdict. *Mar. Overseas Corp.*, 971 S.W.2d at 407; *Thomas*, 290 S.W.3d at 453.

### 2. Analysis

Big Dog Logistics contends the jury's finding is contrary to the great weight and preponderance of the evidence because SIC breached the CSA in several interrelated respects.

Big Dog Logistics claims that SIC failed to pursue "mutually agreed upon business opportunities," as required by the CSA, and instead pursued its own opportunities at Big Dog Logistics's expense. In support, Big Dog Logistics cites the testimony of Kirk and Lane, insisting they did not authorize SIC to approach Big Dog Logistics's existing clients. According to Big Dog Logistics, SIC not only approached the DHL entities but also attempted to discourage DHL Global Mail from doing business with Big Dog Logistics and now wants a share of Big Dog Logistics's revenues from this client.

Big Dog Logistics also contends SIC violated its agreement under the CSA "to hold in confidence any and all Confidential Information on [Big Dog Logistics] disclosed to [SIC] by [Big Dog Logistics]." The definition of "Confidential Information" included "all project and business information, Prospect and all its business information, business strategies and tactics, business contacts ... customer lists...." According to Big Dog Logistics, SIC misused this confidential information by relying on it to approach Big Dog Logistics's existing clients without authorization.

In addition, Big Dog Logistics contends that SIC's pursuit of its own agenda with Big Dog Logistics's existing clients resulted in its obtaining no new business for Big Dog Logistics, despite Big Dog Logistics's paying SIC substantial monthly retainers.

At trial, Lane expressed his anger with the situation by explaining that Big Dog Logistics brought SIC into its organization

to make money together, created Big Dog Strategic Consulting Group, Inc. to keep SIC away from Big Dog Logistics's core business, and gave SIC office space and other resources from which to pursue business; instead, SIC did not pursue any opportunities, the situation was a total "scam job," and SIC tried to steal the business for which Lane "worked my whole life."

As we have discussed, the jury heard conflicting testimony on whether the DHL entities were "mutually agreed upon business opportunities" under the CSA. The jury, as sole judge of the credibility of witnesses, was free to believe Brasch's testimony that Big Dog Logistics requested SIC to approach these entities and his testimony describing efforts he made to assist Big Dog Logistics in retaining the DHL Global Mail business. *See Pascouet*, 61 S.W.3d at 615–16.

Big Dog Logistics advances several reasons it was unreasonable for the jury to believe Brasch's version of events. Big Dog Logistics suggests Brasch provided conflicting testimony on whether he contacted Chet Paul, or vice-versa, and Paul testified he merely responded to a message to call Brasch. However, when read in context, Brasch actually testified that he ultimately made contact with Paul by contacting Paul's superiors, who instructed Paul to contact Brasch. Therefore, the testimony was not necessarily inconsistent because the pivotal contact was initiated by Brasch although Paul made the telephone call in which they first spoke.

Big Dog Logistics also cites Brasch's misrepresenting himself to Paul as an employee of Big Dog Logistics as a "prime example" of SIC's pursuit of its own opportunities. In the testimony cited by Big

Dog Logistics, Paul did assert that he thought Brasch was a "Big Dog employee" and would not have spoken with Brasch if he had known differently. However, Paul also clarified there were multiple "Big Dog" entities. Because the parties agreed to jointly form Big Dog Strategic Consulting Group, Inc., Brasch's representing himself as an employee of a "Big Dog" entity did not establish he was working against Big Dog Logistics's interests.

We acknowledge that the testimony of Dr. Gompf indicating Brasch discouraged him from doing business with Big Dog Logistics seems persuasive because Dr. Gompf is a third party with no stake in the present litigation. Nevertheless, the jury was free to decide the weight to assign this factor when evaluating whether Brasch presented Big Dog Logistics favorably to Dr. Gompf.

Finally, we recognize SIC does not cite any evidence that its efforts actually produced revenues for Big Dog Logistics. Specifically, SIC does not seek any bonuses based on any revenues generated through the relationship between Big Dog Logistics or Big Dog Strategic Consulting Group, Inc. and DHL Express.[6] Further, even if Brasch presented Big Dog Logistics favorably to Dr. Gompf, SIC does not cite any evidence demonstrating DHL Global Mail's decision to retain Big Dog Logistics resulted from this conversation. Nevertheless, the CSA required only the pursuit of business and did not guarantee that SIC's services would result in revenues. Under SIC's version, it, at least, pursued "mutually agreed upon business opportunities." We cannot conclude that the evidence supporting SIC's version is so contrary to the overwhelming weight of

---

6. Because SIC does not seek to recover bonuses based on any revenues from DHL Express, this entity is significant only to Big Dog Logistics's counterclaim that SIC breached the CSA by approaching DHL Express.

the evidence as to render the jury's verdict clearly wrong and unjust.

Accordingly, we conclude the evidence is factually sufficient to support the jury's finding that SIC did not breach the CSA. We overrule Big Dog Logistics's fifth issue.[7]

### III. Cross-Appeal of SIC, Brasch, and Floudas

In the cross-appeal, SIC, Brasch, and Floudas (hereafter, "cross-appellants") challenge (1) the jury's finding that Big Dog Logistics, Kirk, and Lane (hereafter, "cross-appellees") did not commit fraud and thus the lack of any finding on conspiracy and (2) the trial court's grant of jnov on the theories for imposing personal liability on Kirk and Lane for the judgment against Big Dog Logistics.[8]

### A. Fraud and Conspiracy

 We will first consider cross-appellants' fourth issue, contending the evidence is factually insufficient to support the jury's finding, in response to Question 4 of the charge, that cross-appellees did not commit fraud. Cross-appellants raised this contention in their motion for new trial. Additionally, the jury was instructed to answer Question 7 only if it answered Question 4 affirmatively. Question 7 inquired whether Kirk and Lane were each part of a conspiracy that damaged cross-appellants. Therefore, cross-appellants contend the judgment should also be reversed for the jury to answer the conspiracy question if we determine the evidence is

factually insufficient to support the finding of no fraud. We have already set forth the applicable standard of review when a party attacks factual sufficiency of the evidence to support a jury finding on which it had the burden of proof.

The jury was given definitions for three alternate methods of committing fraud: material misrepresentation, failure to disclose a material fact, and fraud in the inducement relative to contract formation. On appeal, cross-appellants do not specifically state which method was applicable to this case. However, the evidence they cite to challenge the jury's finding seemed to fit within the first or second methods; they do not contend SIC was fraudulently induced to contract with Big Dog Logistics, although they made such an argument to the jury.

The jury was instructed as follows relative to the first and second definitions:

Fraud occurs when—

 a. a party makes a material misrepresentation.

 b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion.

 c. the misrepresentation is made with the intention that it should be acted on by the other party, and

 d. the other party acts in reliance on the misrepresentation and thereby suffers injury.

Fraud also occurs when—

---

7. We note our disposition of this issue is not inconsistent with our conclusion on Big Dog Logistics's first issue. Although the jury was free to believe SIC's evidence showing it did not breach the CSA by approaching the DHL entities, SIC's right to receive bonuses for its services required a written agreement and there was no such agreement as a matter of law.

8. Because there are multiple parties on both sides of these issues, we will refer to SIC, Brasch, and Floudas collectively as "cross-appellants" and Big Dog Logistics, Kirk, and Lane collectively as "cross-appellees," except where necessary to refer to a party separately.

a. a party fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party in ignorant of the fact and does not have an equal opportunity to discover the truth.

c. the party intends to induce the other party to take some action by failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed facts.

. . .

"Misrepresentation" means:

a. a false statement of fact;

b. a promise of future performance made with an intent not to perform as promised;

c. a statement of opinion based on a false statement of fact;

d. a statement of opinion that the maker knows to be false; or

e. an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. . . .

Cross-appellants' challenge to the jury's finding focuses solely on cross-appellees' alleged actions and statements relative to formation of the new corporation, Big Dog Strategic Consulting Group, Inc. According to Brasch's testimony, the parties agreed that Kirk, Lane, Brasch, and Floudas would be directors of the corporation and Brasch and Floudas would own fifty percent of the shares. Big Dog Logistics attorney, William Underwood, offered his legal services to incorporate the new entity. Brasch asked if he and Floudas needed their own attorney, but Underwood replied that was "not necessary" because forming a corporation was a routine matter. Underwood formed the corporation with only himself, Kirk, and Lane as directors. In July 2004, these three directors held shareholder and director meetings in Cancun without notifying Brasch and Floudas. When Brasch asked Underwood about the exclusion of Brasch and Floudas as directors, Underwood replied that there had been a mistake and he would correct the problem through the Secretary of State. Underwood, Kirk, and Lane then represented to Brasch and Floudas that the changes had been made. Brasch subsequently learned through his own research that the Secretary of State had rejected the changes because of a failure to follow proper procedures. As of trial, its records still showed only Underwood, Kirk, and Lane as directors. Further, Brasch suggested that Kirk and Lane did not account for some stock certificates of the new corporation and issued less total shares than agreed on, so they could potentially issue more shares and make themselves majority shareholders, thus diluting the shares already issued to Brasch and Floudas.

Cross-appellants contend that cross-appellees, through these actions, prevented Brasch and Floudas from being directors and equal shareholders so cross-appellees could "take all the revenue for themselves"; when Brasch's persistence thwarted their efforts, cross-appellees diverted revenues received from DHL Global Mail, which Brasch helped generate, around Big Dog Strategic Consulting Group, Inc. and directly to themselves.

However, cross-appellees presented evidence directly contradicting Brasch's testimony. According to Kirk and Lane, all parties agreed Underwood would form the corporation. When Lane and Kirk asked if Brasch and Floudas had an attorney, they responded that "Floudas is better than any attorney." Additionally, Brasch and Floudas were uncertain they wanted

to be directors because of liability concerns. Thus, their presence was not required at the meeting in Cancun because they were not directors, but they were informed about the meeting. The evidence is undisputed that Underwood later attempted to amend the articles of incorporation to add Brasch and Floudas, but the amendment was rejected by the Secretary of State because of procedural defects. However, Kirk explained that he subsequently refused to pay the fee necessary to correct the defect because he learned SIC had attempted to solicit Big Dog Logistics's clients.

Again, we are presented with conflicting testimony on whether any misrepresentations or failures to disclose were made concerning the incorporation of Big Dog Strategic Consulting Group, Inc., and the jury was free to believe cross-appellees' testimony. We cannot conclude the evidence supporting cross-appellees' version is so contrary to the overwhelming weight of the evidence as to render the jury's verdict clearly wrong and unjust.

With respect to the manner in which cross-appellees issued shares in the new corporation, cross-appellants cite no evidence that any dilution of Brasch's and Floudas's shares actually occurred. Consequently, cross-appellants cite no evidence showing that any allegedly false promise to make Brasch and Floudas 50% shareholders caused any injury.

In sum, the evidence is factually sufficient to support the jury's finding that cross-appellees did not commit fraud. Accordingly, we overrule cross-appellants' fourth issue.

**B. Theories Regarding Personal Liability of Kirk and Lane**

In their first issue, cross-appellants contend the trial court erred by granting jnov with respect to the jury's finding, in response to Question 10 of the charge, that several of the "Big Dog" entities, Kirk, and Lane operated as a single business enterprise, to the extent it imposed liability on Kirk and Lane individually. In their second and third issues, cross-appellants contend the trial court erred by granting a jnov with respect to the jury's affirmative answers to Questions 11 and 12 of the charge, asking whether Kirk and Lane respectively were "responsible for the conduct of Big Dog Logistics."

After cross-appellants filed their brief, the Texas Supreme Court rejected single business enterprise as a basis for piercing the corporate veil and imposing one corporation's liabilities on another. *See SSP Partners v. Gladstrong Invs. (USA) Corp.,* 275 S.W.3d 444, 450–56 (Tex.2008). Nevertheless, even our court, when previously espousing the single-business-enterprise theory, adopted it as a basis for imposing one corporation's liabilities on another and not as a separate ground of recovery. *See Paramount Petroleum Corp. v. Taylor Rental Ctr.,* 712 S.W.2d 534, 536 (Tex. App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.), *abrogated by SSP Partners,* 275 S.W.3d 444. Moreover, Questions 11 and 12 were submitted solely as a basis for imposing liabilities of Big Dog Logistics on Kirk and Lane and not as separate causes of action. Indeed, alter ego theories, when applicable, are used to impose corporate liabilities on shareholders. *See SSP Partners,* 275 S.W.3d at 451–52.

As explained, SIC cannot prevail on its breach-of-contract claim against Big Dog Logistics—the only claim on which the trial court awarded damages to SIC—and we have upheld the take-nothing judgment on cross-appellants' fraud claim against Big Dog Logistics. Therefore, the challenge to the jnov on the findings relative to single business enterprise and personal responsibility of Kirk and Lane is rendered

moot by our dispositions relative to the breach-of-contract and fraud claims. Accordingly, we overrule cross-appellants' first, second, and third issues.

## IV. CONCLUSION

We reverse the portion of the trial court's judgment awarding Strategic Impact Corporation $1,298,902.90 in actual damages, trial and appellate attorney's fees, costs of court, and pre and post-judgment interest against Big Dog Logistics, Inc., Big Dog Capital Corp., Big Dog Expediting, Inc., Big Dog Air Freight, Big Dog Logistics I, L.P., Big Dog Logistics, L.L.P., Frogfire Technologies, Inc., and Big Dog Group, Inc. and render judgment that Strategic Impact Corporation take nothing on its breach-of-contract claim. We affirm the remainder of the judgment.