**AFFIRMED and Opinion Filed October 17, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-01331-CV**

**ONCOR ELECTRIC DELIVERY COMPANY LLC, Appellant**
**V.**
**VICTOR QUINTANILLA, OSCAR INTERIANO ROSALES, AND**
**ACCIDENT FUND INSURANCE COMPANY OF AMERICA, Appellees**

**On Appeal from the 160th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-03500**

## MEMORANDUM OPINION

Before Justices Schenck, Osborne, and Partida-Kipness
Opinion by Justice Osborne

A jury found appellant Oncor Electric Delivery Company LLC (Oncor) negligent in connection with an incident where two excavation workers were electrocuted when a guy wire anchored in the location of a hole that the workers were excavating suddenly became energized. The workers sued Oncor, contending that Oncor was negligent by installing an insulator on the guy wire that was too short to prevent the guy wire from becoming energized when it sagged onto an electrified jumper. Oncor asserted, among other things, that the workers' claims were barred by Chapter 752 of the Texas Health and Safety Code because the workers were

responsible for the work and failed to provide notice to and make mutual safety arrangements with Oncor before beginning the work. At trial, however, the jury made findings adverse to Oncor on its alleged Chapter 752 defense.

In five issues, Oncor challenges (1) the sufficiency of the evidence that Oncor was negligent; (2) whether the evidence conclusively established Oncor's alleged Chapter 752 defense, or whether the evidence is insufficient to support the jury's adverse findings on the defense; (3) whether the trial court erred by refusing to submit a general contractor's negligence and proportionate responsibility to the jury; (4) whether the trial court erred by refusing to include a certain instruction in the jury charge relating to Oncor's alleged Chapter 752 defense; and (5) whether the workers' counsel engaged in incurable improper jury argument. We affirm.

## BACKGROUND

We draw the following facts from the record, viewed in the light most favorable to the verdict.

In July 2016, appellees Victor Quintanilla (Victor) and Oscar Interiano Rosales (Oscar) were working as excavation workers for Alvarenga Underground Construction, LLC (Alvarenga) when they sustained severe personal injuries from an electric shock. Alvarenga installs underground utilities such as fiber-optic and telephone cable. At the time of the incident, Victor and Oscar were digging a hole for a road bore for utility services to cross under a road in a road-widening project.

Alvarenga was working as a subcontractor for Henkels & McCoy, Inc. (HMI). HMI had been hired as the general contractor by Frontier.[1]

The pit the men were digging was near a utility pole containing high voltage overhead lines. The pole was stabilized by a system of guy anchors in the ground that pulled tension on the guy wires attached to the top of the utility pole. The guy wire at issue was secured by a guy anchor that was located within the location of the pit that Victor and Oscar were digging. As Victor and Oscar dug the hole, they slowly removed dirt around the guy anchor, and the guy wire sagged down onto an electrified jumper coming around the utility pole. While Victor and Oscar were in the hole, the guy wire became energized, resulting in severe injuries to both men.

Oncor claimed ownership of the guy wire and guy anchor but not the utility pole. Oncor had constructed the guy-wire system in approximately 1986 to 1987. The two-foot insulator that Oncor installed on the guy wire, however, was too short to prevent the guy wire from becoming energized if the guy wire sagged and came into contact with the electrified jumper coming around the pole.

Victor and Oscar sued Oncor for negligence and gross negligence, alleging, *inter alia*, that Oncor owed the public, including Victor and Oscar, a duty to properly design and erect its equipment and that the insulator for the guy wire did not meet

---

[1] The record reflects that Verizon had hired HMI and that Verizon subsequently became Frontier. For ease of reference, we will refer to Verizon and Frontier as simply "Frontier."

relevant design standards because it did not adequately protect against the guy wire's becoming energized.[2]

Oncor answered, asserting, *inter alia*, that it was entitled to statutory indemnification for all liability under § 752.008 of the Texas Health and Safety Code. It also alleged that Victor's and Oscar's damages were caused by their own negligence or the negligence of other third parties. Oncor moved to designate HMI and Alvarenga as responsible third parties, and the trial court granted both motions.

The case was tried to a jury. At the close of Victor and Oscar's case, Oncor moved for a directed verdict on appellees' gross-negligence and negligence claims and on certain elements of Oncor's alleged indemnity affirmative defense under Chapter 752. The trial court granted a directed verdict on appellees' gross-negligence claims but denied the remainder of the motion. After the close of all evidence, Oncor again moved for a directed verdict, which the trial court denied.[3]

At the charge conference, the trial court overruled Oncor's objections to (1) the charge's omission of HMI from the negligence and proportionate-responsibility questions and (2) the omission of certain instructions from a question purportedly pertaining to Oncor's indemnity defense under Chapter 752.

---

[2] Victor and Oscar asserted additional claims but nonsuited them during trial.

[3] At trial, Oncor took the position that Victor and Oscar caused the guy anchor to suddenly jerk out of the ground and the guy wire to spring into the air where it contacted the electrified line. Oncor does not urge this theory on appeal. Thus, we do not address it.

–4–

The jury returned a verdict finding Victor, Oscar, Alvarenga, and Oncor each negligent and apportioned responsibility as follows: Victor 2%; Oscar 1%; Alvarenga 49%; and Oncor 48%. The jury also made findings adverse to Oncor on its alleged indemnity defense under Chapter 752.

The trial court denied Oncor's motion for judgment notwithstanding the verdict (JNOV motion). The trial court signed a final judgment against Oncor awarding Victor and Oscar damages and prejudgment interest totaling $532,072.72 and $870,861.08, respectively, plus postjudgment interest and court costs.[4] Oncor timely filed a motion for new trial, which the trial court denied. This appeal followed.

## ISSUES ON APPEAL

On appeal, Oncor asserts the following five issues, some of which include subparts:

(1)     There was factually and legally insufficient evidence of Oncor's negligence.

(2)     Oncor proved as a matter of law that Victor's and Oscar's claims were barred by the doctrine of circular indemnity under Chapter 752 of the Texas Health and Safety Code in that Oncor proved Victor and Oscar (a) were responsible for the work and (b) were performing a function or activity that caused any part of a tool, equipment, machine, or material to be brought within six feet of a high voltage overhead line. Alternatively, the jury's answers to these two issues were so against the great weight and preponderance of the evidence that they were clearly wrong and unjust.

---

[4] The final judgment incorporates by reference a written stipulation filed by appellees and intervenor Accident Fund Insurance Company of America (AFICA) regarding AFICA's rights of reimbursement for workers' compensation benefits paid to Victor and Oscar.

–5–

(3)     The trial court erred by failing to include HMI, a responsible third party and the project's contractor, on the verdict form for determinations of negligence and proportionate responsibility.

(4)     The trial court erred by failing to instruct the jury that a person brings material within six feet of a high voltage overhead line for purposes of Chapter 752 if the person causes a material already within six feet of a high voltage overhead line to make physical contact with the high voltage overhead line or to come closer to the line.

(5)     Appellees' counsel engaged in incurable jury argument by (a) misstating the law regarding a material already within six feet of an overhead line under Chapter 752 and (b) providing an invalid basis, not supported by the evidence, upon which the jury could have held Oncor liable for negligence.

For the reasons discussed below, we resolve all issues against Oncor.

**STANDARDS OF REVIEW**

When a party attacks the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof at trial, it must demonstrate there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). In determining whether the evidence is legally sufficient to support a finding, we consider the evidence in the light most favorable to the judgment and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.*

A complaint that the evidence is legally insufficient will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810. "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). There is more than a scintilla of evidence "when the evidence as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

When a party attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). When reviewing a "matter of law" challenge, we must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id*. Anything more than a scintilla of evidence is legally sufficient to support the finding. *Formosa Plastics Corp.*, 960 S.W.2d at 48. If there is no evidence to support the finding, we will then examine the entire record to determine if the contrary position is established as a

matter of law. *Dow Chem. Co.*, 46 S.W.3d at 241. The point of error is sustained only if the contrary proposition is conclusively established. *Id.*

A party attacking the factual sufficiency of the evidence to support an adverse finding on which the party did not have the burden of proof must demonstrate on appeal that there is insufficient evidence to support the adverse finding. *Hoss v. Alardin*, 338 S.W.3d 635, 651 (Tex. App.—Dallas 2011, no pet.). In reviewing the challenge, we consider all the evidence and set the verdict aside only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Id*.

A party attacking the factual sufficiency of the evidence of an adverse finding on which the party had the burden of proof must demonstrate on appeal that "the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242. We consider and weigh all the evidence, and we set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819 (legal-sufficiency review); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual-sufficiency review). We may not substitute our own judgment for that of the factfinder merely because we might reach a different result. *See City of Keller*, 168 S.W.3d at 819.

We review a trial court's rulings on motions for directed verdict and for judgment notwithstanding the verdict under a legal-sufficiency standard. *See id.* at 827.

We review a trial court's submission of jury instructions and questions for an abuse of discretion. *Dallas Area Rapid Transit v. Morris*, 434 S.W.3d 752, 757 (Tex. App.—Dallas 2014, pet. denied); *Janga v. Colombrito*, 358 S.W.3d 403, 408 (Tex. App.—Dallas 2011, no pet.). The trial court must submit a question that is raised by the written pleadings and the evidence, and it may refuse to submit a properly worded question only if there is no evidence in the record to warrant its submission. *See Janga*, 358 S.W.3d at 408.

A trial court is given wide latitude to determine the propriety of explanatory instructions and definitions. *Morris*, 434 S.W.3d at 757. Rule 277 affords the trial court considerable discretion in deciding what jury instructions are necessary and proper. *Id.* (citing TEX. R. CIV. P. 277). For an instruction to be proper, it must (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and evidence. *Id.*

Finally, we review a trial court's denial of a motion for new trial for abuse of discretion. *Dugan v. Compass Bank*, 129 S.W.3d 579, 582 (Tex. App.—Dallas 2003, no pet.). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or acts without reference to any guiding rules or principles. *Id.*

A judgment will not be reversed on grounds that the trial court made an error of law unless the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case to the court of appeals. TEX. R. APP. P. 44.1(a).

## OVERVIEW OF CHAPTER 752 OF THE
## TEXAS HEALTH AND SAFETY CODE

Because Oncor raises Chapter 752 of the Texas Health and Safety Code in multiple issues, we briefly summarize its relevant sections and how Oncor invokes them to assert an affirmative defense to Victor's and Oscar's negligence claims.

**A.     Statutory Framework of Chapter 752**

Chapter 752 restricts certain activities near high voltage overhead lines. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 752.001–.008. Oncor relies upon §§ 752.001, .003, .004, and .008 to establish its alleged affirmative defense.

Section 752.001 defines "high voltage" and "overhead lines." *Id*. § 752.001.

Section 752.003 requires forty-eight hours' notice and other safety precautions to be followed when certain functions or activities are performed within certain prescribed distances of a high voltage overhead line. *See id.* § 752.003. Specifically, subsection (a) states: "***A person, firm, corporation, or association responsible for temporary work or a temporary activity or function*** closer to a high voltage overhead line than the distances prescribed by this chapter must notify the operator of the line at least 48 hours before the work begins." *Id*. § 752.003(a)

–10–

(emphasis added). Subsection (b) then prohibits a person, firm, corporation, or association from beginning the work, activity, or function until the person, firm, corporation, or association *responsible* for the work, activity, or function and the owner or operator, or both, have negotiated certain mutual safety arrangements. *See id.* § 752.003(b). The person, firm, corporation, or association *responsible* for the work, activity, or function is then required to pay the operator of the line the actual expenses the line operator incurs in providing the clearances prescribed by their agreement. *See id.* § 752.003(c). The line operator is not required to provide clearance until such payment is made. *See id.*

The distances prescribed by Chapter 752 are found in §§ 752.004 and .005. Oncor does not rely upon § 752.005, so we do not address it. Section 752.004 states:

(a)     Unless a person, firm, corporation, or association effectively guards against danger by contact with the line as prescribed by Section 752.003, the person, firm, corporation, or association, either individually or through an agent or employee, may not perform a function or activity on land, a building, a highway, or other premises *if at any time it is possible that the person performing the function or activity may*:

(1)     move or be placed within six feet of a high voltage overhead line while performing the function or activity; or

(2)     *bring any part of a tool, equipment, machine, or material within six feet of a high voltage overhead line while performing the function or activity*.

(b)     A person, firm, corporation, or association may not require an employee to perform a function or activity prohibited by Subsection (a).

*Id*. § 752.004 (emphases added). Oncor does not rely upon § 752.004(a)(1), so we do not address it. Oncor contends the work at issue fell within § 752.004(a)(2), as discussed below.

Finally, § 752.008 imposes liability upon a person, firm, corporation, or association who violates Chapter 752 when the violation results in physical or electrical contact with a high voltage overhead line. That section states:

> If a violation of this chapter results in physical or electrical contact with a high voltage overhead line, the person, firm, corporation, or association that committed the violation is liable to the owner or operator of the line for all damages to the facilities and for all liability that the owner or operator incurs as a result of the contact.

*Id*. § 752.008.

## B. The Four Elements that Oncor Contends Establish an Affirmative Defense Based on Chapter 752 in this Case.

Oncor's position, as we understand it, is that the excavation work Victor and Oscar were performing required compliance with the notice and safety precautions of § 752.003 because the excavation work supposedly fell within § 752.004(a)(2). As shown above, that section concerns a situation where it is possible that the person performing the work may "***bring*** any part of a tool, equipment, machine, or material ***within*** six feet of a high voltage overhead line." *Id*. § 752.004(a)(2) (emphases added). The evidence at trial indicated that before the work began, the guy wire at issue was attached to the utility pole and already within six feet of the electrified jumper located high up on that utility pole. Below are four photographs taken at the location of, and after, the incident at issue:

–12–







Nonetheless, Oncor contends the work fell within § 752.004(a)(2) because Victor and Oscar caused the guy wire to move closer to and make contact with the electrified line.[5]

---

[5] It is not necessary for the disposition of this appeal for us to determine whether "it is possible that the person performing the function or activity may . . . *bring* any part of a tool, equipment, machine, or material

Oncor's position is that Victor and Oscar each violated Chapter 752 because they were both persons responsible for the work and failed to provide Oncor with the required notice and to make mutual safety arrangements with Oncor before beginning the work as required by § 752.003. Oncor then relies upon the indemnification in § 752.008 and the doctrine of "circular indemnity" to assert that Victor's and Oscar's purported Chapter 752 violations constitute an affirmative defense that bars their claims. The "circular indemnity" doctrine, assuming it applies in this context, would preclude a plaintiff who violates Chapter 752 (and whose violation results in physical or electrical contact with a high voltage overhead line) from any recovery because, under § 752.008, the plaintiff would be required to pay his own damages. *Wolfenberger v. Houston Lighting & Power Co.*, 73 S.W.3d 444, 447–48 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Relying on this doctrine, Oncor argues that "a plaintiff who is injured as a result of contact with a high voltage power line may not recover against the owner or operator of the power line where the evidence conclusively establishes the plaintiff failed to comply with the requirements of [Chapter 752]."

---

*within* six feet of a high voltage overhead line while performing the function or activity" when, as in this case, the material at issue is already within six feet of a high voltage overhead line before the work begins. TEX. HEALTH & SAFETY CODE ANN. § 752.004(a)(2) (emphasis added); *see* TEX. R. APP. P. 47.4.

According to Oncor, its circular indemnity defense based on §§ 752.001, .003, .004, and .008 in this case required proof of the following four elements:

(1)    the lines in question constituted "high voltage" "overhead lines" as defined by § 752.001;

(2)    Victor and Oscar did not provide Oncor with notice pursuant to Chapter 752;

(3)    Victor and Oscar were responsible for the work, activity, or function at issue; and

(4)    Victor and Oscar brought a tool, equipment, machine, or material within six feet of Oncor's high-voltage overhead line.[6]

For simplicity, we refer to these purported elements as (1) the Voltage element, (2) the Notice element, (3) the Responsibility element, and (4) the Six-Feet element.

## C.    We Assume Without Deciding that Oncor Has Identified the Elements to Establish an Affirmative Defense, if any, Based on Chapter 752.

Oncor's argument raises a preliminary question about whether a line owner or operator may assert the indemnity provision in § 752.008 as an affirmative defense to bar an injured plaintiff's negligence claims. It also raises a question about how, if at all, such an affirmative defense applies when, as in this case, there is more than one plaintiff, particularly if only one is found to have violated Chapter 752.

Some of our sister courts have held that under the doctrine of circular indemnity, a plaintiff who violates Chapter 752 and is injured by contact with a high

---

[6] Victor and Oscar contend that Oncor had the burden to (1) submit a predicate question on the applicability of an exemption found in § 752.002 and (2) prove that Victor and Oscar were within the reach of the statute. Oncor contends that § 752.002 is inapplicable here. We need not address these arguments to dispose of this appeal. *See* TEX. R. APP. P. 47.4.

voltage overhead line is barred from recovering damages from the line owner or operator. *See, e.g.*, *Presley v. Gulf States Utils. Co.*, No. 09-10-00039-CV, 2010 WL 4264097, at *2–6 (Tex. App.—Beaumont Oct. 28, 2010, pet. denied) (mem. op.); *Trail v. Friedrich*, 77 S.W.3d 508, 513–14 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *Chavez v. City of San Antonio ex rel. City Public Serv. Bd. of San Antonio*, 21 S.W.3d 435, 438–440 (Tex. App.—San Antonio 2000, pet. denied). *Cf. Wolfenberger*, 73 S.W.3d at 447–48 (plaintiff at least raised fact issue on application of circular indemnity doctrine). Neither this Court nor the Supreme Court of Texas, however, has addressed the issue or outlined the elements necessary to establish any such affirmative defense.

We assume without deciding that §§ 752.001, .003, .004, and .008 of the Texas Health and Safety Code establish an affirmative defense and that Oncor has identified the essential elements necessary to establish such an affirmative defense, if any, based on those sections. *See* TEX. R. APP. P. 47.4. We express no opinion on whether any such affirmative defense exists under Texas law or on the elements necessary to establish an affirmative defense, if any, under Chapter 752. *See id.* We also express no opinion on how, if at all, the affirmative defense would apply in a case such as this where there is more than one injured plaintiff. *See id.*

## EVIDENCE ON ONCOR'S CHAPTER 752 AFFIRMATIVE DEFENSE (ISSUE TWO)

### A.    Overview of Oncor's Arguments on Appeal

We will address Oncor's second issue first. Oncor contends that it conclusively established its right to judgment under Chapter 752 because it "conclusively established each necessary element of Oncor's circular indemnity defense as a matter of law." Alternatively, it argues that "the evidence was too weak to support the jury's findings relating to the elements of Chapter 752."

Oncor contends that the trial court submitted Question Nos. 2 and 3 to obtain jury findings on the Responsibility and Six-Feet elements, respectively, of Oncor's Chapter 752 defense. Oncor acknowledges that the jury's "NO" answers to these questions constituted findings adverse to Oncor.[7] Oncor challenges those findings on appeal.

Our analysis below turns on the Responsibility element, addressed in jury Question No. 2. Oncor argues that the evidence presented at trial conclusively established that Victor and Oscar were "responsible for the work, activity, or function" or, alternatively, that the evidence at trial was too weak to support the jury's adverse findings.

---

[7] We discuss Question No. 2 below. In Question No. 3, the jury was asked: "On July 12, 2016 at the time of the occurrence in question, were [Victor and Oscar] performing a function or activity that caused any part of a tool, equipment, machine, or material to be brought within six feet of a high voltage overhead line?" The jury answered "NO."

With respect to the Six-Feet element (addressed in Question No. 3), Oncor argues that the evidence conclusively established that Victor and Oscar brought part of a tool, equipment, machine, or material within six feet of Oncor's high voltage overhead line or, alternatively, that the evidence was too weak to support the jury's adverse finding.

With respect to the Voltage element, Oncor contends that appellees' counsel stipulated as to the facts establishing the element and that the jury was instructed accordingly.

With respect to the Notice element, Oncor contends that the trial court submitted Question No. 4 to obtain a jury finding on that element. The jury answered "NO" in response to Question No. 4, and Oncor contends that this constituted a favorable finding establishing the Notice element of its affirmative defense.[8]

As we discuss below, after reviewing the record, we conclude that the evidence supporting the jury's answers to Question No. 2—relating to the Responsibility element—is legally and factually sufficient, negating that element.

---

[8] In Question No. 4, the jury was asked to answer "yes" or "no" as to each Victor, Oscar, and Alvarenga with respect to the following:

> Before the temporary work, activity, or function that [Victor and Oscar] were performing at the time of the occurrence in question began, did any of those named below notify Oncor of the work, activity, or function they would be performing at least 48 hours before the work began, and negotiate a satisfactory mutual arrangement with Oncor to provide temporary de-energization and grounding, temporary relocation or raising of its overhead line, or temporary mechanical barriers to separate and prevent contact between the line and the material or equipment involved in the work, activity, or function?

The jury was instructed that a "yes" answer must be based on a preponderance of the evidence and that if it did not find that a preponderance of the evidence supported a "yes" answer, then it must answer "no." The jury answered "NO" as to Victor, Oscar, and Alvarenga in Question No. 4.

Thus, we need not address Oncor's arguments regarding the other three elements of its alleged Chapter 752 defense. *See* TEX. R. APP. P. 47.4.

**B.     The Evidence Supporting the Jury's Adverse Findings in Question No. 2 Is Legally and Factually Sufficient.**

Question No. 2, which related to the Responsibility element of Oncor's Chapter 752 affirmative defense, asked the jury the following:

> Were any of the persons named below responsible for the work, activity, or function Victor Quintanilla and Oscar Rosales were performing on July 12, 2016[,] at the time of the occurrence in question?
>
> "Responsible for the work, activity, or function" means one who desires to temporarily carry on the work and who therefore exercises some degree of control over the worksite. Factors to be considered to determine whether someone is responsible for the work, activity, or function include:
>
> (1) knowledge of the specific proposed location of the work;
>
> (2) participation in deciding where the work will be performed;
>
> (3) presence at the worksite;
>
> (4) involvement after hiring a contractor to perform services; and
>
> (5) ownership interest in the property where the work was conducted.

The charge asked the jury to answer "Yes" or "No" as to Victor and Oscar, separately. The jury answered "NO" as to both.

Chapter 752 does not define "person, firm, corporation, or association responsible" for the work, activity, or function. *See* TEX. HEALTH & SAFETY CODE

–19–

ANN. §§ 752.001, .003. Here, the jury was provided with a definition and five non-exclusive factors to consider when determining whether Victor and Oscar were persons responsible for the work, activity, or function at issue. The definition and its factors do not come from the plain-language of Chapter 752, nor do they seem to take into account the provisions of § 752.003 that require a person responsible for the work to pay for the line operator's actual expenses in providing any agreed-upon clearance of the lines. *See id.* §§ 752.003(c), (d). But there was no objection to the form of Question No. 2, so we measure the legal and factual sufficiency of the evidence against the charge as given. *See Seger v. Yorkshire Ins. Co., Ltd.*, 503 S.W.3d 388, 407 (Tex. 2016) (legal sufficiency); *Westview Drive Invs., LLC v. Landmark Am. Ins. Co.*, 522 S.W.3d 583, 602 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (factual sufficiency). We express no opinion on whether the form of Question No. 2, including the definition and factors listed therein, accurately states Texas law. *See* TEX. R. APP. P. 47.4.

Oncor organizes its argument according to the five factors listed in Question No. 2 and discusses Victor and Oscar together. So we will do the same.

### 1. Knowledge of the specific proposed location of the work

Oncor's argument regarding the first factor consists of two sentences:

As to the first factor, the evidence presented at trial conclusively established that [Victor and Oscar] were familiar with and had **knowledge** of the location of the work to be performed. [RR 3:80-81, 135-138]. Moreover, they both testified that they could easily see

–20–

> Oncor's guy anchor and attached guy wires before they began digging the bore pit in the exact same location. [RR 3:85, 120]

This argument and the cited portions of the record are inapposite. They do not address or evidence Victor's or Oscar's having knowledge of a "proposed" location of the work. The cited portions of the record, and other portions that Oncor ignores, show that Victor and Oscar dug in the location staked by Frontier. Oncor does not cite, and we have not found, evidence showing that the location Frontier had staked was a "proposal" or that Victor and Oscar could have proposed a different location.

For example, Daryl McElroy, a regional supervisor for HMI, testified that Frontier had told Alvarenga where to dig. Angel Alvarenga, an Alvarenga supervisor, also testified that Frontier had told them where to dig and that Victor and Oscar were told to dig the hole in the exact location they were because that is where Frontier had staked it. He explained that the hole they were digging was in preparation for a road bore; they were going to cross the road in that location because there was a cross-connect box where they had to bring service from one side of the road to that box, and they needed the hole in that location. Angel testified that Frontier had placed stakes exactly where it wanted the new line.

Victor testified that his job was to dig a hole to put down telephone cable. He testified that the location is marked by the telephone company. Victor explained that he typically makes sure about where the hole is marked, waits for the order from his supervisor to start digging, and then starts digging. Oscar, who had been working

for Alvarenga only for a matter of months, agreed with Victor's description of a typical day and that it was accurate as to what happened on the day of the incident.

After reviewing the entire record, we conclude that the record does not conclusively establish the first factor in jury Question No. 2 in Oncor's favor. A reasonable jury could conclude on this record that the first factor weighed against a finding that either Victor or Oscar was responsible for the work, activity, or function at issue.

### 2.    Participation in deciding where the work will be performed

Oncor argues that the evidence at trial conclusively established the second factor in Question No. 2 "because [Victor and Oscar] had some discretion in determining the exact location of the bore pit and the manner in which the bore pit would be dug." According to Oncor, "it was undisputed at trial that both [Victor and Oscar] exercised **control** over the location and nature of the work being performed and were in a position to notify Oncor that they planned to excavate the guy anchor, but simply chose not to do so." Oncor contends that no one from Alvarenga or HMI was supervising Victor and Oscar or providing them with guidance about how deep or wide to dig the pit, that Victor and Oscar saw the guy anchor and guy wires and chose to excavate the guy anchor anyway, and that Victor and Oscar had input and responsibility amongst the two of them for determining how to perform the work.

To support its argument, Oncor cites the same evidence it cited in support of the first factor, plus additional portions of Victor's, Oscar's, and Angel's testimony.

Oncor's argument again strays from the factor given to the jury: Participation in deciding *where* the work will be performed. As discussed above with the first factor, there is more than a scintilla of evidence that Victor and Oscar dug in the location staked by Frontier and could not choose a different location for the pit. The additional portions of the record Oncor cites do not demonstrate Victor's or Oscar's participating in deciding "where" the work will be performed.

Even if a decision about "where" the work would be performed implicated a decision about how deep to dig the hole or, specifically, a decision to excavate the guy anchor, the evidence is not conclusive in Oncor's favor. For example, McElroy, the HMI regional supervisor, was asked: "And at that location why did they have to dig as deep as they had to?" He answered, "If I recall, this was a road expansion. And they were actually dropping the depths of the road, the whole area, so they had to go deeper and move all the utilities over so it would be out of the roadway."

Further, Victor testified that a supervisor ordered him to dig no more than four feet and that it was not his judgment call, or his sole decision, as to how deep to dig. He also testified that on the day of the incident, he did what he was told to do by his employer and that he did the same task that he had done numerous times before.

Victor denied touching the guy wire or guy anchor, denied causing the guy anchor to move, and denied digging the anchor completely out of the ground. Victor

also testified that he comes across guy wires "[a]lmost every day," that he has worked and dug around guy wires "[m]any times," and that, in his experience, guy wires are not hot. At one point, Victor was asked: "If [the job] calls for you to dig around the guy wire, do you need to do anything different than what you would do in the past?" He answered: "No. The same thing."

Similarly, Oscar testified that on the day of the incident, he did what he was told to do by his employer, that he dug up to the depth he was told to dig, that this was the same task he had done numerous times before, and that he did not have any reason to believe the guy wire was going to be hot. He further testified that he dug around the anchor wire thinking it was safe; he had done so numerous times in the past without issue. Oscar also denied moving the anchor or causing it to move.

Additionally, Angel denied that they removed the anchor and testified that they worked around the anchor. And Johnny Dagenhart, appellees' expert, testified that he was not "so sure that [Victor and Oscar] intended to dig up the anchor itself." He testified, "They were digging a hole and the anchor happened to be there."

Even if the evidence on some of these points was conflicting, the trier of fact assesses the credibility of the witnesses and the weight to be given their testimony and can accept all, part, or none of the testimony or make its own deductions from the evidence. *Cain v. Pruett*, 938 S.W.2d 152, 159 (Tex. App.—Dallas 1996, no writ). The jury as the trier of fact has the responsibility to judge the credibility of the witnesses, to assign the weight to the witnesses' testimony, and to resolve any

inconsistencies in the testimony. *Id.* The jury may accept or reject all or part of the witnesses' testimony. *Id.*

Moreover, even if the presence of a supervisor is relevant, the evidence on this point is also not conclusive in Oncor's favor. Victor testified that a supervisor was there when they arrived at the site. Angel, an Alvarenga supervisor, did testify that no one from HMI or Frontier had come to watch and that Victor and Oscar were left in the hole unsupervised. But he also testified about his coming to the site and inspecting the scene before Victor and Oscar began digging and about how he saw the markings on the ground and the guy wire before they started digging. Angel also testified that he had been standing there when Victor and Oscar started digging and stopped watching after they had dug out the first few feet. He further explained that when he left Victor and Oscar, he was "across the street" taking a trailer off a truck.

Based on our review of the entire record, the evidence regarding the second factor in Question No. 2 is not conclusive in Oncor's favor. A reasonable jury could conclude, on this record, that the second factor weighed against a finding that either Victor or Oscar was responsible for the work, activity, or function at issue.

### 3. Presence at the worksite

There is no dispute that Victor and Oscar were present at the worksite. This is where they were injured while performing their excavation work as Alvarenga employees. This factor favors Oncor.

### 4. Involvement after hiring a contractor to perform services

Oncor argues that the fourth factor in Question No. 2 was conclusively established by testimony showing that Victor and Oscar were the only two persons physically present at or in the bore pit at the time the work was performed. According to Oncor, the evidence it cites shows that (1) the next nearest person was Angel, who was approximately 300 feet away and did not observe Victor and Oscar as they excavated the guy anchor, and (2) Angel testified that he had no idea that Victor and Oscar were excavating, manipulating, or otherwise altering the position of the guy anchor.[9]

Oncor's argument is inapposite to the fourth factor in Question No. 2. Oncor makes no argument and cites no evidence showing that Victor or Oscar hired a contractor or that they were involved after another contractor was hired to perform any services. And we have found no such evidence. Rather, the record reflects that HMI was Frontier's general contractor, that Alvarenga was HMI's subcontractor, and that Victor and Oscar were Alvarenga's employees; nothing in the record indicates that anyone else was hired for this excavation work.

Based on our review of the entire record, the evidence regarding the fourth factor in Question No. 2 is not conclusive in Oncor's favor. A reasonable jury could

---

[9] As shown above, the record does not support Oncor's contentions about what Angel's testimony was concerning his supervision of Victor and Oscar and their having moved the guy anchor. And the cited portions of the record do not reflect that Angel was "approximately 300 feet away"; we have found no such evidence.

conclude that this fourth factor weighed against a finding that either Victor or Oscar was responsible for the work, activity, or function at issue.

### 5. Ownership interest in the property where the work was conducted

Oncor acknowledges in its brief that Victor and Oscar "did not have an ownership interest in the property where the work was being performed." But Oncor takes the position that we should "minimally consider that factor" and instead focus on whether an employee had "some degree of control" over the worksite and the actual work being performed. We reject Oncor's argument.

The jury was instructed that it could consider whether Victor and Oscar had an ownership interest in the property where the work was conducted when determining whether Victor or Oscar was responsible for the work, activity, or function at issue. It was not instructed to "minimally consider" this fifth factor.

When a case is tried to a jury and the party complaining on appeal did not object to the charge (as in this case), the sufficiency of the evidence is measured against the court's charge, not some other law not identified in the charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). The jury was free to decide the weight to assign to each of the five nonexclusive factors listed in the jury charge. *See Big Dog Logistics, Inc. v. Strategic Impact Corp.*, 312 S.W.3d 122, 136–37 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Based on our review of the record, the fifth factor in Question No. 2 is not conclusive in Oncor's favor and a reasonable jury could conclude that this factor

weighed against a finding that either Victor or Oscar was responsible for the work, activity, or function at issue.

### 6. One who desires to temporarily carry on the work and who therefore exercises some degree of control over the worksite

Oncor concludes its discussion of the sufficiency of the evidence to support the jury's adverse findings on Question No. 2 by stating that the evidence "conclusively established" that Victor and Oscar were both "the **sole persons** with **knowledge** of and discretionary **control** over the specific work being performed and the only two individuals who remained **present** at the worksite and remained involved in the work at issue for the entirety of its duration." It further argues: "Alternatively, the evidence at trial was too weak to support the jury's finding[s] that [Victor and Oscar] were not responsible for the work."

Oncor's arguments concerning control over the worksite seem to derive from the general definition set forth in Question No. 2. Specifically, the question defined "[r]esponsible for the work, activity, or function" as "one who desires to temporarily carry on the work *and* who therefore exercises some degree of control over the worksite." (Emphasis added.)[10] Oncor cites three cases from our sister courts (*Chavez*, 21 S.W.3d at 437–38, *Presley*, 2010 WL 4264097, at *6, and *Trail*, 77 S.W.3d at 509–13) and suggests that following those cases compels a conclusion

---

[10] Oncor provides no argument and cites no evidence showing how either Victor or Oscar "desire[d] to temporarily carry on the work." A determination of the effect, if any, of Oncor's failure to address the first portion of the definition in Question No. 2 is not necessary to dispose of this appeal. *See* TEX. R. APP. P. 47.4.

that the evidence conclusively establishes that Victor and Oscar were responsible for the work. Oncor's argument is not persuasive for three reasons.

First, to the extent Oncor's discussion of the factors in Question No. 2 addressed Victor's and Oscar's control over the worksite, Oncor's arguments are either not supported by the record or require this Court to ignore the evidence that supports the challenged findings and to consider only the evidence that, in Oncor's view, is contrary to the adverse findings, as discussed above. Thus, Oncor's legal- and factual-sufficiency challenges to the jury's answers to Question No. 2 are contrary to our standards of review. *See Dow Chem. Co.*, 46 S.W.3d at 241–42.

Second, Oncor's reliance upon the cited cases is misplaced. The sufficiency of the evidence in this case is measured against the court's charge, not some other law not identified in the charge. *See Osterberg*, 12 S.W.3d at 55. The charge defined a person who is "[r]esponsible for the work, activity, or function," and the jury was then free to consider and weigh the five listed factors to determine if Victor or Oscar fell within that definition. We defer to the jury's role to weigh the factors listed in Question No. 2. *See Rangel v. Rivera*, No. 14-14-00623-CV, 2015 WL 4930894, at *3 (Tex. App.—Houston [14th Dist.] Aug. 18, 2015, no pet.) (mem. op.).

Third, the cases cited by Oncor are distinguishable. Each is a summary-judgment case. And in each case, the evidence was ***uncontroverted*** that the person injured (1) was working as a volunteer or independent contractor and not as an employee or (2) was an employee who was not doing the job he had been instructed

–29–

to do by his employer or at the employer's worksite. *See Chavez*, 21 S.W.3d at 437–38 (person injured had volunteered to trim a tree for a friend's mother); *Trail*, 77 S.W.3d at 509–13 (person injured was working on the roof of a building as an independent painting contractor and the premises owner did not retain any right to direct the details of the painter's work); *Presley*, 2010 WL 4264097, at *1–2 (person was injured when he raised the bed of his employer's truck at an auto-parts store, but the injured person had taken the truck to the store without telling his employer rather than going to employer's dig site as his employer had instructed).

By contrast, this is a jury-trial case. And the evidence about Victor's and Oscar's control over the worksite was not uncontroverted. There was also no contention that Victor or Oscar were volunteers (like in *Chavez*) or independent contractors (like in *Trail*). Although Victor and Oscar were employees like the plaintiff in *Presley*, there is more than a scintilla of evidence in this case that Victor and Oscar were doing the job that their employer had instructed them to do: they dug in the location where they had been told to dig, they were at the worksite where their employer had instructed them to go, and they did their work while a supervisor was either standing there watching them or was across the street.[11]

---

[11] In its reply brief, Oncor cites *Jordan v. Centerpoint Energy Houston Elec., LLC*, No. 14-18-00663-CV, 2019 WL 5565978, at *6 (Tex. App.—Houston [14th Dist.] Oct. 29, 2019, pet. denied) (mem. op.), for the general definition of a person responsible for the work. But *Jordan* is another summary-judgment case, and the person injured did not dispute on appeal that he alone controlled the work and was a person responsible under § 752.003. *Id*. Oncor also cites *AEP Tex. N. Co. v. SPA Pipe, Inc.*, No. 03-06-00122-CV, 2008 WL 5210919, at *6 (Tex. App.—Austin Dec. 12, 2008, pet. dism'd) (mem. op.), in its discussion of Question No. 2 in its reply. But in that case, the court assumed without deciding that courts should consider

After reviewing the entire record, the evidence relating to control over the worksite is not conclusive in Oncor's favor and a reasonable jury could conclude that Victor and Oscar did not exercise some degree of control over the worksite.

**7.    Conclusion**

Viewing the evidence in the light most favorable to the challenged findings, we conclude that more than a scintilla of evidence supports the jury's answers on Question No. 2. Further, considering and weighing all of the evidence, we cannot say that the evidence supporting the jury's answers on Question No. 2 is so weak or that the findings are so against the overwhelming weight of the evidence that the findings are clearly wrong and unjust. Thus, the evidence is legally and factually sufficient to support the jury's adverse answers on Question No. 2.

Oncor did not conclusively establish the Responsibility element of its Chapter 752 defense or successfully challenge the jury's adverse answers to Question No. 2. Thus, we need not address the remaining elements addressed in jury Question Nos. 3 and 4. We overrule Oncor's second issue.

## EVIDENCE OF ONCOR'S NEGLIGENCE
### (ISSUE ONE)

In its first issue, Oncor argues that there was factually and/or legally insufficient evidence of Oncor's negligence. In Question No. 1, the jury was asked,

---

whether a person had some degree of control over a worksite when determining who is a person responsible for the work and then concluded that a ***fact issue*** existed on whether the ***movant*** had such control. *See id.* at *6 n.10.

–31–

"Did the negligence, if any, of those named below proximately cause the occurrence in question?" The jury was asked to answer "Yes" or "No" as to Victor, Oscar, Alvarenga, and Oncor, separately. The jury answered "Yes" as to each.

Oncor argues that the jury's negligence finding against Oncor is supported by insufficient evidence because there is legally and/or factually insufficient evidence of (1) foreseeability; (2) proximate cause; (3) negligence, duty, foreseeability, and causation due to Chapter 752; and (4) negligence due to appellees' trespass upon Oncor's chattel. We resolve this issue against Oncor.

## A.    Foreseeability

Oncor contends that there is legally and/or factually insufficient evidence that its "use of a two-foot guy insulator posed a foreseeable risk of harm to [Victor and Oscar]." It argues that "this occurrence, or some similar event" was unforeseeable as a matter of law because it could have not foreseen that Victor and Oscar would "excavate" the guy anchor without notice to or authorization from Oncor.

To support its position, Oncor contends that the undisputed evidence at trial was that the guy wire, as installed, was incapable of becoming energized unless tension on it was released. It then points to evidence that it contends shows that utility poles commonly last seventy years or more and that the guy-wire system at issue had existed for approximately thirty years without sagging or becoming energized before Victor and Oscar purportedly "excavated the guy anchor." According to Oncor, guy-wire sagging is rare, the circumstances under which guy-

wire sagging is expected were not present here, and the mere possibility of the occurrence did not make it foreseeable.

In short, Oncor's argument, as we understand it, is that as a matter of law, Oncor's guy-wire system as installed posed no foreseeable danger to Victor or Oscar, or someone similarly situated who digs in proximity to a guy anchor. This is because, in Oncor's view, Victor's and Oscar's actions of purportedly digging up the guy anchor without notice to Oncor was unforeseeable as a matter of law.

Oncor's position ignores the evidence regarding the reasons why it installed an insulator on the guy wire in the first instance (to protect people on the ground from electrocution if the guy wire sags). Its argument is also contrary to Texas law because it focuses on the foreseeability of the specific reason why this guy wire sagged and not on the foreseeable danger that Oncor's negligent act or omission created for others. It is also construing the evidence in a light most favorable to Oncor and ignoring the evidence favorable to the verdict, contrary to our standards of review. *See Dow Chem. Co.*, 46 S.W.3d at 241–42; *Hoss*, 338 S.W.3d at 651.

**1.      A reasonable jury could conclude that Oncor's installing an insulator that was too short to extend past the hot line created a reasonably foreseeable danger of electrocution to Victor and Oscar, or someone similarly situated.**

Foreseeability means that an actor, as a person of ordinary intelligence, should have anticipated the dangers that *his* negligent act or omission created for others. *Alcoa, Inc. v. Behringer*, 235 S.W.3d 456, 460 (Tex. App.—Dallas 2007, pet. denied). As we explained in *Alcoa, Inc.*, the Texas Supreme Court uses the following

two-prong test for foreseeability: (1) that the injury be of such a general character as might reasonably have been anticipated, and (2) that the injured party should be so situated with relation to the wrongful act that injury to him or one similarly situated might reasonably have been foreseen. *Id.* (citing *Mellon Mtge. Co. v. Holder*, 5 S.W.3d 654, 655 (Tex. 1999)). "Foreseeability requires only that the general danger of a harmful event occurring be foreseeable." *Sanmina-SCI Corp. v. Ogburn*, 153 S.W.3d 639, 642 (Tex. App.—Dallas 2004, pet. denied). "The question of foreseeability . . . involves a practical inquiry based on common experience applied to human conduct." *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (internal quotation marks and citation omitted).

Following Texas law, the proper inquiry regarding the foreseeability element of appellees' negligence claims was whether a person of ordinary intelligence should have anticipated that ***Oncor's*** negligent act or omission—here, installing an insulator that was too short to extend past the hot line if the guy wire sagged onto an electrified jumper—created a reasonably foreseeable danger of electrocution to Victor and Oscar, or someone similarly situated. *See Alcoa, Inc.*, 235 S.W.3d at 460. More than a scintilla of evidence demonstrated that the answer to that question was yes. For example:

- **Terry Mayo**, Oncor's distribution-standards manager and representative at trial, testified that power companies must effectively insulate their guy wires to prevent them from becoming electrified and to protect us all from electrocution. He agreed that "[g]uy wires do sag" and that this occurs

"because the anchor moves," "[i]f someone digs [the anchor] up," and because of "soil erosion."

Mayo's testimony evidenced that at least one reason why Oncor installs insulators on guy wires is to prevent electricity from traveling to the ground when the guy wire sags and contacts energized equipment; the insulator would not allow enough current to flow through it.

Mayo also testified that the pole and guy wire at issue were subject to the 1984 National Electric Safety Code (NESC). The record reflects that as to guy insulators, the NESC states: "Insulators shall be so placed that in case any guy sags down upon another, the insulators will not become ineffective." Mayo testified that the pole was also governed by a design standard that Oncor created and originally published in 1969 and that the intent behind that standard was for the insulator to extend past the hot wire.

Mayo further testified that Oncor installs insulators to protect everyone on the ground, including utility workers like Victor and Oscar, from electrocution. He testified about how certain utility workers on the ground are particularly at risk of being electrocuted: "[T]here's a couple of different groups of people that aren't as educated about the hazards of electricity [as Oncor's utility workers] and that's primarily children, and then other workers who are working near utility lines." Mayo explained that "[j]ust because you're working and a contractor and you're working around energized equipment, you've not necessarily been trained on the dangers."

Mayo acknowledged that the insulator at issue did not extend past the hot wire and that this included when the pole was built in 1986.

- **Ian Neff**, an HMI safety manager, testified about excavation workers like Victor and Oscar as being among the types of utility workers who work near energized equipment without appreciating the danger. He testified that Alvarenga is an excavation-digging outfit and that excavation workers are trained on below-ground dangers; they are not typically trained on aerial dangers or on identifying inadequately insulated guy wires. Neff testified that some crews like Alvarenga dig in proximity to anchors and guy wires every day, all day, and that it is common practice to move underground utilities.

- **Angel Alvarenga** testified that Alvarenga "work[s] around saggy guy wires all the time," that he encounters sagging guy wires "[o]n a daily" basis, and

that he saw sagging guy wires as he drove to court that day. He also testified that the guy wire at issue was sagging before they started digging.

- **Johnny Dagenhart, P.E.**, appellees' electrical-engineering expert, testified that the insulator is placed on the pole so electricity does not transmit to the ground if the guy sags down "for whatever reason." Dagenhart testified that the insulator is there to protect everyone, even people digging up the anchor. According to Dagenhart, these insulators have been used since at least 1977. The record reflects that this guy-wire system was installed in 1986 to 1987.

  According to Dagenhart, an inadequate safeguard or an ineffective fail-safe was like a ticking time bomb and an "accident waiting to happen eventually." He also testified: "People are going to do expected activities. Digging a hole in the ground is an expected activity. And, generally speaking, that's taking into account with the 811 dial-before-you-dig-type situation under most circumstances now." He further testified: "[T]he electric industry tries to take into account the expected activities. And, hopefully, even people doing foolish things sometimes and still not getting hurt."

- **Forest J. Smith, P.E.**, Oncor's electrical-engineering expert, provided testimony showing that the electrical-power industry has known since at least the 1920s that guy wires sag and lose tension and that these things are foreseeable to power companies. He also testified about an insulator's role in protecting people working on the ground near a utility pole. He testified that a guy wire that contacts hot wires is an electrical hazard and that an insulator is a safeguard that protects people when guy wires contact hot wires.

  Smith also testified that the "whole reason for the insulator is to interrupt any path to ground the current might take," explaining that "an insulator . . . blocks electric current from flowing." He admitted that the "insulator was there to protect Oscar and Victor." Smith also agreed that the insulator at issue did not extend past the hot wire when Victor and Oscar arrived at the worksite.

On this evidence, a reasonable jury could conclude that power companies like Oncor have been aware for nearly a century that guy wires sag and lose tension. It could also conclude that even if guy-wire sagging is not common (though there was testimony evidencing it happens more regularly), Oncor understands that the potential danger of a sagging guy wire is significant enough—particularly to

untrained utility workers—that Oncor has been installing insulators on its guy wires for decades. Thus, a jury could reasonably conclude that Oncor's installing an insulator that was too short to extend past the hot line if the guy wire sagged created a reasonably foreseeable danger of electrocution to Victor and Oscar, or someone similarly situated.

### 2. Oncor's foreseeability argument erroneously focuses on the foreseeability of the precise manner by which Victor and Oscar were injured.

In its challenge to the foreseeability element of appellees' negligence claims, Oncor focuses on how, in Oncor's view of the evidence, the guy-wire system stood before Victor and Oscar began digging. As we understand its argument, Oncor contends that the guy-wire system could pose a danger only as it stood if someone dug up the anchor and that such an occurrence is unforeseeable as a matter of law. Oncor cites three cases from other jurisdictions to support its position: *Hercules Powder, Co. v. Disabatino*, 188 A.2d 529 (Del. 1963), *Rank v. Metro. Edison Co.*, 87 A.2d 198 (Pa. 1952), and *Greenwald v. N. States Power Co.*, 32 N.W.2d 320 (Minn. 1948). We reject Oncor's argument for four reasons.

First, Oncor's foreseeability argument is premised on a contention that it was entitled to notice of the work and had to authorize the work before it began; this implicitly assumes that Chapter 752 applied to the excavation work at issue. As discussed above, Oncor did not conclusively establish its Chapter 752 defense.

–37–

Second, Oncor's focus on the foreseeability of the specific reason why this guy wire sagged is contrary to Texas law. Foreseeability "does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 519 (Tex. 2019). "It requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Id.* (internal quotation marks and citation omitted). "The test is not what the [defendant] believed would occur," and it does not "require that he anticipate just how injuries will grow out of that dangerous situation." *Id.* at 520 n.12 (citation omitted, brackets in original). Rather, the issue is "whether he ought reasonably to have foreseen that the event in question, or some similar event, would occur." *Trinity River Auth. v. Williams*, 689 S.W.2d 883, 886 (Tex. 1985).

Third, even if it were relevant, Oncor's arguments that the guy-wire system as it stood posed no foreseeable danger and that someone's digging up the guy anchor is unforeseeable as a matter of law are based on a view of the evidence that is favorable to its position and that ignores the evidence favorable to the verdict. This is contrary to our standards of review. *See Dow Chem. Co.*, 46 S.W.3d at 241–42; *Hoss*, 338 S.W.3d at 651. As shown above, multiple witnesses (including Dagenhart, Mayo, Neff, Angel, Victor, and Oscar) provided testimony from which a reasonable jury could conclude that the guy-wire system, as it stood, created a foreseeable danger to others; that someone's digging up a guy anchor is foreseeable; that guy

wires can sag due to things like soil erosion; that this guy wire was sagging before the work began; and that guy-wire sagging occurs often.

Although Oncor solicited testimony that Victor's and Oscar's actions, as Oncor views them, were not foreseeable and that Oncor has reason to expect that members of the working public will comply with Chapter 752 (assuming it applies), the jury was free to reject it. *See City of Keller*, 168 S.W.3d at 819–20; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *Cain*, 938 S.W.2d at 159. Moreover, the trial court admitted into evidence Oncor's "Safety Smart–Know the Law" brochure discussing Chapter 752. That brochure stated that responsible parties who violate Chapter 752 are subject to criminal penalties. *See* TEX. HEALTH & SAFETY CODE ANN. § 752.007 (imposing a criminal penalty for violations of Chapter 752). Evidence of the existence of a criminal penalty for a Chapter 752 violation was some evidence that work performed in violation of the statute was reasonably foreseeable.

Fourth, the three decades' old cases cited by Oncor from other jurisdictions are distinguishable and not persuasive. In *Hercules Powder*, a man was killed after he grasped a hanging guy wire that had been cut loose from its anchor by an unknown third person. 188 A.2d at 531. At the trial of that case in the early 1960s, *all experts agreed* that as installed and attached to their anchors, the guy wires in question were in no way dangerous, could not possibly have become energized, and would not readily become loosened. *Id*. at 531–33. Here, there was no such

agreement. Indeed, Dagenhart's testimony was essentially that Oncor's installing an insulator that was too short to extend past the hot line was a ticking time bomb.

In *Greenwald*, a man located in a rural area was electrocuted and killed when he disconnected an uninsulated guy wire at the anchor. 32 N.W.2d at 320–21. But in that case from the 1940s, the evidence was that insulators were not used in rural regions. *Id*. at 321. On the record before it, the court concluded that "[t]he guy wires were so installed as to involve no danger at all to persons on the ground" and that "was the full measure of defendant's duty to decedent." *Id*. at 322. In the instant case, however, the record contains evidence showing that Oncor acknowledges it owes a duty to insulate its guy wires to protect the public, including workers like Victor and Oscar, from electrocution. Unlike *Greenwald*, there was evidence in this case, based on events taking place decades later, that the guy wire at issue was supposed to be insulated and the insulator was supposed to extend past the hot wire.

In *Rank*, the court expressly declined to address whether a plaintiff's detachment of a guy wire from an anchor fell within a foreseeable orbit of danger and instead ***assumed*** negligence on the part of the defendant. 87 A.2d at 199–200. The court did not hold, as Oncor contends, that "inadequately insulated guy wires pose no foreseeable risk of harm where guy wire had remained in original condition and had never become energized in 16 years since installation."

Oncor attempts to liken the facts of this case to those in the above three cases by referring to Mayo's testimony that he has "not known anyone at Oncor to have

been injured or killed by sagging guy wires." Oncor fails to acknowledge that in the next question, Mayo was asked: "But that's the reason they started putting insulators on guy wires 50 years ago." And he answered: "It is part of the code." Oncor's argument also ignores testimony from Mayo, Dagenhart, and Smith evidencing that the code and/or design standards applicable here required the insulator to extend past the hot line at issue.

All three cases cited by Oncor were issued years, if not decades, before the 1984 NESC and 1969 Oncor design standards applicable to the pole at issue. Even if Oncor solicited different opinions on the proper interpretations of those standards at trial, the jury was free to reject that testimony. *See City of Keller*, 168 S.W.3d at 819–20; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *Cain*, 938 S.W.2d at 159.

Oncor also cites *Dyess v. Harris*, 321 S.W.3d 9, 13–15 (Tex. App.—Houston [1st Dist.] 2009, pet. denied), and *Stumph v. Dallas Fire Insurance Co.*, 34 S.W.3d 722, 730 (Tex. App.—Austin 2000, no pet.), to argue that the mere existence of a result that was within the realm of possibilities does not make a risk of harm reasonably foreseeable. But Oncor's reliance upon these cases is misplaced. *Dyess* concerns whether the defendants could have reasonably foreseen the criminal acts of a third party; this is not an issue raised in this case. *See* 321 S.W.3d at 13–17 (involving foster parents and foster-care agency being sued for negligence after a foster child who was placed in the foster parents' home sexually assaulted another child in the home). *Stumph* is an insurance-policy-interpretation case that does not

address or even use the word "negligence." *See* 34 S.W.3d at 724–34. Both cases are inapposite to the foreseeability analysis of appellees' negligence claims.

Accordingly, we reject Oncor's arguments challenging the foreseeability element of Victor's and Oscar's negligence claims.

## B.    Proximate Cause

Oncor next argues that Victor and Oscar "presented legally and/or factually insufficient evidence of proximate causation." According to Oncor, this is because, in its view, "[Victor's and Oscar's] decision to excavate the guy anchor without authorization or notice to Oncor, causing the guy wire to become energized, was entirely unforeseeable as a matter of law and severed the chain of proximate causation." Oncor's argument, as we understand it, is that the evidence conclusively demonstrates that Victor's and Oscar's actions, as Oncor views them, constituted a new and independent cause.

This argument again assumes that Chapter 752 applied to the work at issue and that Victor and Oscar violated that chapter. As shown above, Oncor did not conclusively establish its Chapter 752 defense.

Regardless, Oncor's argument misconstrues Texas law governing new and independent cause. A new and independent cause of an occurrence is the act or omission of a separate and independent agent, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question. *Columbia Rio Grande Healthcare, L.P. v. Hawley*,

–42–

284 S.W.3d 851, 856 (Tex. 2009). The theory of new and independent cause is a component of the proximate-cause issue that a jury may consider in determining the existence or non-existence of proximate cause. *Id.*

"[U]nder Texas law, a new and independent cause that extinguishes the liability of a party cannot arise out of an affirmative act of negligence by either the plaintiff or the defendant." *Biaggi v. Patrizio Rest. Inc.*, 149 S.W.3d 300, 305 (Tex. App.—Dallas 2004, pet. denied). "The defensive issue of new and independent cause can be raised and attributed only to some outside agency operating to cause the complained-of injury." *Id*. As a result, any negligence by Victor or Oscar, even if it contributed to each of their own injuries, did not act to ***extinguish Oncor's liability for*** injuries caused by ***its own*** negligence. *See id*. at 305–06.

In fact, none of the authorities cited by Oncor in support of its proximate-cause argument are on point. For example, Oncor cites *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753, 758 (Tex. 1998), and *Bos v. Smith*, 556 S.W.3d 293, 304–05 (Tex. 2018). But both cases concerned whether the defendant owed a duty to protect someone from the criminal acts of a third party. Here, Oncor is complaining about Victor's and Oscar's acts, not the criminal acts of a third party.

Oncor also cites *Seaway Products Pipeline Co. v. Hanley*, 153 S.W.3d 643, 658 (Tex. App.—Fort Worth 2004, no pet.). In that case, a third-party excavator had ruptured a pipeline company's pipeline. *Id.* at 647–48. The pipeline company then sued the developers of the land based on the theory that the developers were

negligent by platting the lot so that the pipeline would run under the front of the lot rather than on the back or sides of the lot. *Id.* In the portion of the case cited by Oncor, the court was addressing whether the developers could have foreseen that their platting of a lot so that the pipeline ran under the front of the lot could have led to the ***third-party excavator's*** rupture of the pipeline. *Id.* at 658. The court did not hold that the ***pipeline company's own actions*** (who are in the same posture as Victor and Oscar here) constituted a new and independent cause that severed the chain of proximate cause. *See id.*

Oncor also cites *Alabama Power Co. v. Moore*, 899 So. 2d 975, 977 (Ala. 2004). According to Oncor, the *Moore* court held that a "directed verdict was proper in favor of an electric utility where the plaintiff [had] used tools to remove a guy wire from a guy anchor, causing the guy wire to lose tension and become energized after touching an energized 'stinger' wire." But the utility company in *Moore* ***did not dispute*** that it was negligent in maintaining the utility pole and guy wire. Rather, the *Moore* court held that the plaintiff's intentional actions "superseded any alleged negligence or wantonness" of the utility company. *Id.* at 980. Oncor fails to recognize, however, that *Moore* was decided under Alabama law—and Alabama (unlike Texas) is a contributory-negligence state.[12] Thus, the analysis in *Moore* does not comport with the law in Texas. *See Biaggi*, 149 S.W.3d at 305–06.

---

[12] In Alabama, "[c]ontributory negligence on the part of a plaintiff [that] proximately contributes to the plaintiff's injuries will bar recovery." *Creel v. Brown*, 508 So. 2d 684, 687–88 (Ala. 1987); *see also Hawkins v. Simmons*, 295 So. 3d 683, 688 (Ala. Civ. App. 2019).

Accordingly, we reject Oncor's contention that Victor's and Oscar's actions, even as Oncor views them, constituted a new and independent cause that severed the chain of proximate causation.

## C. Negligence, Duty, Foreseeability, and Causation Due to Chapter 752

Oncor's third argument is that there is legally and/or factually insufficient evidence of "negligence, duty, foreseeability, and causation due to [Victor's and Oscar's] failure to comply with the notice requirements of Chapter 752 of the Texas Health and Safety Code." According to Oncor, "Where a statutory scheme exists for making utilities aware of work that may interfere with the utility's infrastructure, it is unforeseeable that individuals will be injured by a utility's infrastructure where the party failed to notify the utility before beginning the work." Oncor then argues:

> Here, [Victor and Oscar] presented legally and/or factually insufficient evidence of negligence, duty, foreseeability[,] and causation[] because they presented legally and/or factually insufficient evidence that anyone provided Oncor with any type of notice required by Chapter 752. In fact, the evidence presented at trial conclusively established that no one provided Oncor with any type of notice required by Chapter 752.

Oncor further contends that it had "no duty to foresee that someone would be conducting work that would cause them to excavate the guy anchor and reposition the guy wire to come into contact with Oncor's high voltage overhead lines because Oncor had received no notice under Chapter 752." And, it argues, "Oncor could not have foreseen that [Victor and Oscar] would perform their work in such a reckless manner as to cause the type of occurrence at issue in this case." Oncor's arguments are unpersuasive.

–45–

Oncor's position appears to be that when a statutory scheme exists for making utilities aware of work that may interfere with the utility's infrastructure, it is unforeseeable as a matter of law that individuals will be injured by a utility's infrastructure when the party failed to notify the utility before beginning the work.[13] Oncor cites two cases to support its argument, but neither case stands for such a broad proposition. *See Seaway Prods. Pipeline Co.*, 153 S.W.3d at 658 (holding pipeline company offered no summary-judgment evidence demonstrating that the rupture of its pipeline by a third-party excavator was foreseeable to the developers when they platted the lot so that pipeline ran in the front of the lot); *Hanus v. Tex. Utils. Co.*, 71 S.W.3d 874, 877, 882–84 (Tex. App.—Fort Worth 2002, no pet.) (holding that a plaintiff did not present summary-judgment evidence showing that power company's decision to bury power lines created a duty to warn the homeowners of the dangers associated with buried power line).

Further, Oncor is merely repeating its contentions that (1) it could not have foreseen the specific manner in which this incident occurred and (2) Victor's and Oscar's actions, as Oncor views them, constitute a new and independent cause. As discussed above, these positions are contrary to Texas law, based on a view of the

---

[13] Oncor's argument is again premised on an unstated assumption that Oncor conclusively proved that it was entitled to notice of the work under Chapter 752 and that the required notice was not provided. As shown above in our discussion of Oncor's second issue, Oncor did not conclusively prove at least one element necessary to establish its alleged affirmative defense under Chapter 752. We express no opinion on whether, on this record, Oncor proved or obtained findings from the jury that Oncor was entitled to but did not receive notice under Chapter 752 in this case. *See* TEX. R. APP. P. 47.4.

–46–

evidence that is contrary to our standards of review, or both. *See McKenzie*, 578 S.W.3d at 519 (discussing foreseeability of manner in which incident occurred); *Biaggi*, 149 S.W.3d at 305–06 (discussing new and independent cause).

Oncor contends that in *Mountain States Telephone & Telegraph Co. v. Vowell Construction Co.*, 341 S.W.2d 148, 150 (Tex. 1960), the Supreme Court of Texas held that a "telephone company could not have foreseen that city would excavate its telephone cable where city never informed company that it would be conducting work near underground cable." We disagree. In that case, a telephone company asserted a trespass claim against a contractor, and the court analyzed whether the evidence at trial conclusively established that the construction company had committed a trespass by severing a cable that was lawfully located in the street. *See* 341 S.W.2d at 149–51. Chapter 752 was not at issue in that case, nor was any other statutory scheme for making utilities aware of work that may interfere with the utility's infrastructure. The court did not analyze whether the contractor's actions were reasonably foreseeable to the telephone company; the words "foresee" and "inform" do not appear, in any variation, in the opinion at all. *See id.* at 148–51.

Finally, Oncor cites *Bryant v. Gulf Oil Corporation*, 694 S.W.2d 443, 446 (Tex. App.—Amarillo 1985, writ ref'd n.r.e.), regarding the duties owed by an occupier of premises to the employees of an independent contractor. But *Bryant* is distinguishable because it was a premises liability case, the defendant had "no control over the installation or the maintenance of the highline," and the case did not

concern the foreseeability of whether the employee of a subcontractor may engage in work without providing a utility with notice required by any particular statute. *See id*. at 446–47. The instant case was submitted to the jury as an ordinary negligence case, and the evidence supporting the jury's ordinary-negligence finding against Oncor is what Oncor is challenging on appeal.

Accordingly, and after reviewing the entire record, we reject Oncor's contention that Victor's and Oscar's actions, even as Oncor views them, rendered the evidence of "negligence, duty, foreseeability, and causation" legally or factually insufficient.

## D. Trespass Upon Oncor's Chattels

Oncor's fourth challenge to the evidence supporting the negligence finding is premised on the notion that Victor and Oscar were trespassers to Oncor's chattels. Oncor argues: "Because [Victor and Oscar] were trespassers, the evidence of negligence at trial was legally and/or factually insufficient." Oncor contends that Victor and Oscar "excavated" the guy anchor and caused the guy wires to change position and that by doing so, they became trespassers as to Oncor's chattels. Thus, it argues, "Oncor did not owe them a duty of ordinary care in negligence in installing and maintaining the guy anchor or guy wires." Instead, Oncor contends that it is not liable "absent a showing of gross negligence."

"A detention of personalty lawfully obtained, after demand, is a wrongful act constituting a trespass." *Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201

(Tex. 1981). And as this Court has explained, "A trespass to chattels is a wrongful interference with or injury to property that causes actual damage to the property or deprives the owner of its use for a substantial period of time." *Armstrong v. Benavides*, 180 S.W.3d 359, 363 (Tex. App.—Dallas 2005, no pet.). Oncor did not make any argument about trespass to chattels until after the jury's verdict. No question or instruction was requested by Oncor about appellees' "detention of personalty" or "injury to property." *See Zapata*, 615 S.W.2d at 201; *Armstrong*, 180 S.W.3d at 363. Instead, based on instructions requested by Oncor, the jury considered whether Oncor's negligence was a proximate cause of appellees' injuries. The same question and instruction also inquired about appellees' negligence, and the jury made findings accordingly. As we have discussed, there was legally and factually sufficient evidence to support the jury's findings. Consequently, we reject Oncor's contention that "the evidence was legally and/or factually insufficient to establish negligence as to a trespasser."

### E.     Conclusion

Viewing the evidence in the light most favorable to the challenged finding, we conclude that more than a scintilla of evidence supports the jury's negligence finding against Oncor in Question No. 1. Further, considering and weighing all of the evidence, we cannot say that the evidence supporting the jury's negligence finding as to Oncor on Question No. 1 is so weak or that the finding is so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust.

–49–

Thus, the evidence is legally and factually sufficient to support the jury's finding against Oncor in Question No. 1, and we reject all of Oncor's arguments to the contrary. We overrule Oncor's first issue.

## JURY CHARGE ERROR
## (ISSUES THREE AND FOUR)

### A.    Submission of HMI's Negligence to the Jury (Issue Three)

In its third issue, Oncor contends that the trial court erred by failing to include HMI, the general contractor, on the verdict form for determinations of negligence (Question No. 1) and proportionate responsibility (Question No. 5). As discussed above, Question No. 1 asked, "Did the negligence, if any, of those named below proximately cause the occurrence in question?" In Question No. 5, the jury was asked to assign percentages of responsibility only to those the jury found had caused or contributed to the occurrence in Question No. 1.

HMI was not a party to this case. But prior to trial, the trial court granted Oncor's motion to designate HMI as a responsible third party. HMI's status as a designated responsible third party, however, did not guarantee HMI's inclusion on the verdict form. "A trial court may not submit a question to the jury regarding the conduct of any person without sufficient evidence to support the submission." *Gregory v. Chohan*, 615 S.W.3d 277, 298 (Tex. App.—Dallas 2020, pet. granted) (en banc) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(b)).

### 1. Governing law

A party has produced sufficient evidence to support submission of a question to the jury when it provides more than a scintilla of evidence of potential responsibility for the claimed injury. *Id*. "To support a finding that a third party was responsible based on negligence, a defendant must produce evidence of a legal duty owed to the claimant by the third party, a breach of that duty, and damages to the claimant proximately caused by the breach of the duty." *In re Kilmer*, No. 05-20-00814-CV, 2021 WL 1290734, at *3 (Tex. App.—Dallas Apr. 7, 2021, orig. proceeding) (mem. op.) (citation omitted).

Thus, the trial court erred by failing to include HMI on the verdict form on Question Nos. 1 and 5 only if there was legally sufficient evidence that (1) HMI, the general contractor, owed Victor and Oscar, the employees of a subcontractor, a duty of ordinary care; (2) HMI breached that standard of care; and (3) such breach was a proximate cause of the occurrence. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(b); *Gardner Oil, Inc. v. Chavez*, No. 12-10-00274-CV, 2012 WL 1623420, at *6 (Tex. App.—Tyler May 9, 2012, no pet.) (mem. op.) ("The trial court should not allow the submission of a question to the jury regarding conduct of a responsible third party where there is not sufficient evidence to support the submission.").

As a general rule, one who employs an independent contractor has no duty to ensure that the contractor performs its work in a safe manner. *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020). An exception exists when "the

employer retains some control over the manner in which the contractor performs the work that causes the damage." *Id*. (internal quotation omitted). If the right to control an independent contractor's work exists, then a duty arises regardless of whether actual control is exercised. *Id*.

In evaluating whether a duty is owed, we consider that an employer must have some latitude to tell its independent contractors what to do, in general terms, without becoming subject to liability. *Id*. The duty arises where the right to control extends to "the means, methods, or details of the independent contractor's work" such that the contractor "is not entirely free to do the work in his own way." *Id*. (internal quotation omitted). Further, the control must relate to the condition or activity that caused the injury. *Id*. No duty of care arises with respect to an independent contractor's work by virtue of the employer's general right to order work started and stopped, to direct when and where the work is done, to require that work be done by a certain time, or to control activities that have "nothing to do with the resulting injury." *Id*.; *see also JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 865 (Tex. 2021) ("[C]ontrol must relate to the condition or activity that caused the injury." [internal quotation omitted]).

### 2. Oncor's arguments regarding the existence of a legal duty owed by HMI to Victor and Oscar

We can ascertain three reasons from Oncor's briefing as to why it contends HMI, the general contractor, owed a legal duty to Victor and Oscar. But none of those reasons establishes error in the trial court's refusal to submit HMI on the

verdict form. Oncor's arguments either are not supported by the record or do not demonstrate that there was sufficient evidence that HMI retained a right to control any activities that had anything to do with Victor's and Oscar's being electrocuted.

### a. Staking the digging area

Oncor contends there was a fact question on whether HMI "incorrectly staked the dig area." It claims that Angel "attested that [HMI] staked the digging area of the project." But the cited portions of the record contain no such testimony, and we have found none. The record reflects that Frontier staked the digging area.

### b. Training of Alvarenga's employees

Oncor contends there was a fact question as to whether HMI "failed to ensure [that] Alvarenga [had] properly trained its employees." According to Oncor, Dagenhart testified that HMI "had a responsibility to ensure [that] Alvarenga provided proper training to its employees" and that "he would expect any experienced person from [HMI] with any knowledge of OSHA regulations . . . to recognize that [Victor and Oscar] were not doing the job correctly." It also contends that McElroy, the HMI regional supervisor, "testified [that] if he had been at the site during the dig[, then] he would have addressed the situation."

In making these arguments, Oncor suggests that Dagenhart's and McElroy's testimony evidenced that HMI owed Victor and Oscar a legal duty to ensure that Alvarenga's employees received OSHA training on aerial dangers. Oncor is taking the cited testimony out of context. In the cited portions of the record, Dagenhart and

McElroy were testifying about Victor's and Oscar's placing the spoil pile on the edge of the trench and about the absence of any shoring in the bore pit. This concerned an issue about whether Victor and Oscar had obtained OSHA training. They were not testifying about any training that related to digging near a guy anchor.

Oncor cites nothing in the record demonstrating that the location of the spoil pile or Alvarenga's not providing Victor and Oscar with OSHA training relating to same proximately caused their being electrocuted. *See JLB Builders, L.L.C.*, 622 S.W.3d at 865; *AEP Tex. Cent. Co.*, 612 S.W.3d at 295; *see also Townley v. Lanier*, No. 14-19-00447-CV, 2021 WL 2325082, at *4 (Tex. App.—Houston [14th Dist.] June 8, 2021, pet. denied) (mem. op.) (overruling complaint trial court erred by omitting designated responsible third party from jury charge because appellant did not cite any portion of the record regarding the contributory conduct of the responsible third party). There was evidence, however, to the contrary. For example, McElroy, the HMI regional supervisor, was asked: "[Did t]he spoil piles and the shoring have anything to do [with] why Victor and Oscar got electrocuted?" He answered: "No, sir." He further testified:

> Q.    . . . . You're a workplace safety guy. If Oscar and Victor had went through the OSHA 10 training, would you have anticipated that they would understand the dangers of an uninsulated guy wire?
>
> A.    No, sir.
>
> Q.    That's not something you all go over in OSHA training, is it?
>
> A.    No, sir.

Neff, an HMI safety manager, also provided testimony showing that OSHA training for excavation workers would typically not include training on above-ground electrical hazards. Thus, even if there were evidence that HMI owed a duty to ensure that Alvarenga had provided Victor and Oscar with OSHA training and that HMI had breached that duty, Oncor points to no evidence showing that such failure had anything to do with Victor's and Oscar's injuries.

### c. Supervision of the worksite

Oncor argues there was a fact question regarding HMI's failure "to adequately supervise the worksite." According to Oncor, HMI "retained some responsibility for the worksite" as the general contractor and that, under its contract with Alvarenga, HMI retained rights to the worksite related to inspections, safety, and plan changes. To support this position, Oncor cites, without explanation, paragraphs 14, 15, and 22(e) of the contract between HMI and Alvarenga. It then references testimony that it contends shows HMI "was not on site to supervise the digging project," suggesting that HMI breached a duty to supervise Victor and Oscar.

Oncor provides no argument, cites no legal authority, and cites nothing in the record to explain how paragraph 14, 15, or 22 of the HMI–Alvarenga contract provided HMI with a right to retain control over the means, methods, or details of the work that related to a condition or activity that caused Victor's and Oscar's being

electrocuted; and we can ascertain no such explanation.[14] *See* TEX. R. APP. P. 38.1(i); *Townley*, 2021 WL 2325082, at \*4. Oncor's position is **not** that HMI had a duty to provide Chapter 752 notice. Oncor made this clear in its reply brief, stating: "[T]here was insufficient evidence to submit Chapter 752 responsibility for [HMI] . . . because [it] did not authorize or know about the guy anchor excavation."

In its reply brief, Oncor raises two new arguments as to why it contends HMI owed Victor and Oscar a legal duty—namely, that HMI failed to exercise reasonable care in selecting Alvarenga as an independent contractor and that HMI has liability if it authorized a trespass to Oncor's chattels. But we cannot consider matters raised for the first time in a reply brief. *See Sanchez v. Martin*, 378 S.W.3d 581, 590 (Tex. App.—Dallas 2012, no pet.).

Accordingly, Oncor failed to demonstrate that there was sufficient evidence to support the submission of HMI's negligence and proportionate responsibility to the jury. Thus, we conclude that the trial court did not err by refusing to grant

---

[14] Paragraph 14 provides that HMI shall have access to the work; that materials furnished and workmanship performed by Alvarenga are subject to HMI's inspection; and that if material or work is found defective or not in conformity with drawings, plans, or specifications, then Alvarenga is required to correct and replace the material or work.

In paragraph 15, HMI reserved the right to make changes to the drawings, plans, specifications, and other work before and during the work.

In Paragraph 22, Alvarenga promised to comply with all applicable safety rules, laws, and regulations, including OSHA, during the performance of its work under the contract. In subparagraph (e), Alvarenga promised to cooperate with any safety inspections or audits.

Oncor's request to submit HMI in the verdict form on Question Nos. 1 and 5. We overrule Oncor's third issue.

## B.     Omission of Instruction from Question No. 3 (Issue Four)

In its fourth issue, Oncor contends the trial court erred by failing to include an instruction in Question No. 3. That question asked: "On July 12, 2016[,] at the time of the occurrence in question, were [Victor and Oscar] performing a function or activity that caused any part of a tool, equipment, machine, or material to be brought within six feet of a high voltage overhead line?" The jury answered: "NO."

Oncor had requested the following instruction to be included with Question No. 3:

> You are instructed that a person brings a tool, equipment, machine, or material within six feet of a high voltage overhead line if the person causes any part of the tool, equipment, machine, or material that is already within six feet of a high voltage overhead line to make physical contact with the high voltage overhead line or to come closer to the line than it existed before the person acted.

Appellees objected to Oncor's tendered instruction as constituting an improper comment on the weight of the evidence. The trial court sustained appellees' objection, signed a tender sheet striking the instruction from Oncor's proposed Question No. 3, and submitted Oncor's proposed Question No. 3 as modified. Oncor subsequently objected to the omission of its proposed instruction on grounds that its instruction was consistent with Texas law and would assist the jury. The trial court implicitly overruled Oncor's objection by stating: "[T]he Court's previous rulings stand." *See* TEX. R. APP. P. 33.1(a)(2)(A).

–57–

On appeal, Oncor argues that the trial court erred by omitting Oncor's proposed instruction in Question No. 3 and that such error was harmful because it related to a contested, critical element of Oncor's Chapter 752 defense and probably caused the rendition of an improper verdict.

Oncor, however, fails to challenge the trial court's ruling sustaining appellees' objection that the proposed instruction constituted an improper comment on the weight of the evidence. A proposed jury instruction that is otherwise in accordance with Texas law may nonetheless be objectionable if it constitutes an improper comment on the weight of the evidence. *See Briones v. Sharkey*, No. 04-11-00584-CV, 2012 WL 3776488, at *2 (Tex. App.—San Antonio Aug. 31, 2012, no pet.) (mem. op.). Because Oncor does not challenge all independent grounds for the trial court's ruling, we overrule Oncor's fourth issue. *See Herczeg v. City of Dallas*, No. 05-19-01023-CV, 2021 WL 1169396, at *2 (Tex. App.—Dallas Mar. 29, 2021, pet. denied) (mem. op.), *cert. denied*, No. 22-128, 2022 WL 4654650 (U.S. Oct. 3, 2022).

Error, if any, in refusing Oncor's requested instruction in Question No. 3 is also harmless. TEX. R. APP. P. 44.1(a). Like Question No. 2, Question No. 3 asked the jury to make a finding that Oncor contends was essential to establishing its alleged Chapter 752 defense. Because we conclude above that the evidence is legally and factually sufficient to support the jury's adverse findings on Question No. 2, any

error in Question No. 3 is immaterial and harmless.[15] *See* TEX. R. APP. P. 44.1(a). Thus, we overrule Oncor's fourth issue for this additional, alternative reason.

## IMPROPER JURY ARGUMENT
### (ISSUE FIVE)

In its fifth issue, Oncor argues that appellees' counsel engaged in incurable jury argument during closing argument by (1) misstating the law regarding a material already within six feet of an overhead line under Chapter 752 and (2) providing an invalid basis, not supported by the evidence, upon which the jury could have held Oncor liable for negligence. We resolve this issue against Oncor.

### A. Preservation of Error

Appellate complaints of improper jury argument must ordinarily be preserved by timely objection and request for an instruction that the jury disregard the improper remark. *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). Oncor made no such objection or request during appellees' counsel's closing argument. Nonetheless, a complaint of incurable jury argument may be asserted and preserved in a motion for new trial, even without a complaint and ruling during the trial. *See* TEX. R. CIV. P. 324(b)(5). Because Oncor raised its incurable-argument contentions in its motion for new trial, which the trial court denied, Oncor preserved this issue for our review.

---

[15] We express no opinion on whether Question No. 3 accurately stated Texas law or requested a finding on an essential element of an affirmative defense, if any, established by §§ 752.001, .003, .004, and .008 of Chapter 752. Nor do we express any opinion on whether the instruction that Oncor requested in Question No. 3 accurately stated the law.

## B. Law Governing Incurable Jury Argument

Incurable jury argument is rare. *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 707 (Tex. App.—Dallas 2008, no pet.). Typically, retraction of the argument or instruction from the court can cure any probable harm. *Phillips*, 288 S.W.3d at 883. Incurable jury argument "is that which strikes at the very core of the judicial process." *Id*. Examples of incurable improper jury arguments can include appeals to racial prejudice; unsupported accusations of witness tampering by the opposing party; and unsupported, extreme, and personal attacks on opposing parties and witnesses. *In re BCH Dev., LLC*, 525 S.W.3d 920, 928 (Tex. App.—Dallas 2017, orig. proceeding).

"The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Phillips*, 288 S.W.3d at 883 (quoting *Goforth v. Alvey*, 271 S.W.2d 404, 404 (Tex. 1954)). In other words, "[t]he complaining party must explain on appeal why opposing counsel's argument was incurable based on an evaluation of the whole case, from voir dire to closing argument." *Arthur J. Gallagher & Co.*, 270 S.W.3d at 708; *see also Pope v. Gaffney*, No. 04-03-00456-CV, 2004 WL 1732325, at *4 (Tex. App.—San Antonio Aug. 4, 2004, no pet.) (mem. op.).

## C. Purported Misstatement of the Law Regarding Chapter 752

Oncor first argues that appellees' counsel misstated the law that governs the applicability of Chapter 752 when a "material" (here, a guy wire) is already within six feet of an overhead line and a plaintiff causes that material to make contact with a high voltage overhead line. This is based on the following portion of appellees' counsel's closing argument:

> [W]hen Victor and Oscar arrived on July 12th, 2016, the guy wire was already within 6 feet of the energized equipment, and they said "yes." Victor and Oscar didn't move anything within 6 feet of the energized source. It was built there.
>
> And the reason that you have an insulator is because it's so close to that guy wire. And that's why you need it to extend all the way past the hot wires. That guy wire is always within 6 feet of that energized equipment.
>
> So when you answer [Question No. 3], performing a function or activity that caused any part to be brought within 6 feet of a high voltage overhead line, you'll answer "no" because they didn't cause anything. When they got there, Oncor told you it was within 6 feet of the energized source.

Oncor contends a reasonable juror could have been persuaded by this argument to answer "No" to Question No. 3 when the juror would otherwise have answered "Yes," and, therefore, the argument probably resulted in the rendition of an improper verdict. We resolve this portion of Oncor's fifth issue against Oncor.

The only effect of appellees' counsel's closing argument, according to Oncor, was to cause the jury to answer "No" to Question No. 3 rather than "Yes." Question No. 3, however, like Question No. 2, is a question that Oncor contends was necessary

–61–

to establish the essential elements of its alleged Chapter 752 defense. As discussed above, the jury's adverse answers to Question No. 2 are supported by legally and factually sufficient evidence, which makes a finding on Question No. 3 immaterial. Thus, even if appellees' counsel's closing argument caused the jury to answer "No" to Question No. 3 when it would have answered "Yes," it was harmless. *See* TEX. R. APP. P. 44.1(a). Accordingly, we overrule the first part of Oncor's fifth issue.

## D.    Additional Theory of Liability

Oncor next contends that appellees' counsel engaged in improper jury argument in the following excerpt of his closing argument:

> Now, I want to talk to you about some very important testimony and why a verdict against Oncor is just. Oncor wants to mince his words about this, but the testimony is clear. There are two scenarios in which Oncor will discover hazards on utility poles. One, an employee happens to pass by the hazard. Two, someone is seriously injured or killed.
>
> That is not acceptable in our community. That is not acceptable that a public utility, a corporation like Oncor, has no program to go find hazards like insulators being too short, and they can sit there for 30 years until they electrocute someone. That is unacceptable.

Oncor contends this argument is improper for three reasons: (1) appellees' counsel asserted issues not supported by the evidence because negligence based on an improper maintenance-and-inspection program must be established through expert testimony, (2) appellees' counsel misstated the law, and (3) appellees' counsel provided the jury with an improper basis upon which to impose liability against Oncor.

According to Oncor, the harm and prejudice caused by appellees' counsel's comments were incurable because a reasonable juror could have been persuaded to answer "Yes" to a broad-form negligence question based on an invalid theory of liability when the juror otherwise would have answered "No." Oncor contends that it is impossible for Oncor or this Court to determine whether the jury found Oncor liable based on the invalid theory that Oncor failed to properly maintain or inspect its equipment. We resolve this portion of Oncor's fifth issue against Oncor.

Assuming without deciding that appellees' counsel's argument was improper, Oncor fails to explain how, based on an evaluation of the whole case, a jury instruction to disregard the argument or withdrawal of the statement would not have cured the alleged harm, if any. *See* TEX. R. APP. P. 38.1(i). Based on our review of the record, we cannot conclude that appellees' counsel's argument is one of the rare instances of improper argument that an instruction from the court or retraction of the argument could not have removed its effect or prevented the members of the jury from following their oaths with proper instructions from the trial court. *See Arthur J. Gallagher & Co.*, 270 S.W.3d at 708; *Pope*, 2004 WL 1732325, at *4. We overrule the second part of Oncor's fifth issue.

## CONCLUSION

Having overruled all five of Oncor's issues, including all subparts, we affirm the judgment of the trial court.


191331f.p05

/Leslie Osborne//
_____
LESLIE OSBORNE
JUSTICE


Schenck, J., Dissenting



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

ONCOR ELECTRIC DELIVERY
COMPANY LLC, Appellant

No. 05-19-01331-CV     V.

VICTOR QUINTANILLA, OSCAR
INTERIANO ROSALES, AND
ACCIDENT FUND INSURANCE
COMPANY OF AMERICA,
Appellees

On Appeal from the 160th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-03500.
Opinion delivered by Justice
Osborne. Justices Schenck and
Partida-Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Victor Quintanilla, Oscar Interiano Rosales and Accident Fund Insurance Company of America recover their costs of this appeal and the full amount of the trial court's judgment from appellant Oncor Electric Delivery Company LLC and from Aspen American Insurance Company as surety on appellant's supersedeas bond.

Judgment entered this 17th day of October, 2022.